No. 53        August 14, 2014        831

IN THE SUPREME COURT OF THE
STATE OF OREGON


SEA RIVER PROPERTIES, LLC,
an Oregon limited liability company,
*Petitioner on Review,*

*v.*

Loren E. PARKS,
an individual,
*Respondent on Review.*


Loren E. PARKS,
an individual,
*Third-Party Plaintiff,*

*v.*

H. Robert RILEY
and Geneva Ruth Riley,
both individually and as Trustees of the
H. Robert Riley Trust and Geneva Ruth Riley Trust;
Donald Lee Riley and Lee Ann Riley,
husband and wife;
David Robert Riley and Catherine Lou Riley,
husband and wife,
*Third-Party Defendants.*

(CC 062011; CA A145896; SC S061094)


On review from the Court of Appeals.*

Argued and submitted September 20, 2013.

Robyn Ridler Aoyagi, Tonkon Torp LLP, Portland, argued the cause and filed the brief for petitioner on review.

G. Kevin Kiely, Cable Huston Benedict Haagensen & Lloyd LLP, Portland, argued the cause and filed the brief for respondent on review. With him on the brief were Laura J. Walker, Casey M. Nokes, and Gretchen S. Barnes.

_____
    * Appeal from Tillamook County Circuit Court, Rick W. Roll, Judge. 253 Or App 643, 291 P3d 1 (2013).

Before Balmer, Chief Justice, and Kistler, Walters, Linder, Landau, and Baldwin, Justices.**

KISTLER, J.

The decision of the Court of Appeals and the judgment of the circuit court are reversed. The case is remanded to the circuit court for further proceedings.

_____

** Brewer, J., did not participate in the consideration or decision of this case.

**KISTLER, J.**

Plaintiff Sea River and defendant Parks own adjoining parcels of land on the central Oregon coast near Nedonna Beach just south of the Nehalem River. Between the 1920s and the 1990s, after the United States government built two jetties to contain the Nehalem River, the ocean and wind deposited sand and silt onto the upland, creating approximately 40 acres of land west of those lots and south of the Nehalem River's southern jetty.[1] The primary issue in this case is who owns those 40 acres (the "disputed property"). Plaintiff filed this action to quiet title to the disputed property, arguing that it owned the property on the basis of its record title, through the law of accretion, or by adverse possession. Defendant counterclaimed, contending that those same legal theories led to the conclusion that he held title to the property.

After a 14-day bench trial, the trial court found that plaintiff's predecessors in interest took title to the disputed property through the law of accretion. The trial court also ruled, however, that defendant later acquired title to the disputed property through adverse possession. The trial court accordingly entered judgment giving defendant title to the disputed property. Plaintiff appealed, challenging the trial court's ruling on adverse possession. Defendant cross-assigned error, challenging the trial court's ruling on accretion. The Court of Appeals affirmed the judgment, concluding that defendant's predecessors in interest had acquired title to the disputed property through the law of accretion. *Sea River Properties, LLC v. Parks*, 253 Or App 643, 297 P3d 1 (2012). We allowed plaintiff's petition for review and now reverse the decision of the Court of Appeals and the trial court's judgment and remand for further proceedings consistent with this opinion.

## I.   FACTS AND PROCEDURE

This case arose as an equitable action to quiet title to real property. Plaintiff and defendant own adjoining lots.

---

[1] On appeal and review, the parties have referred to the accreted land as consisting of approximately 40 acres. There is evidence in the record that the area may be smaller. The exact amount of the area does not affect our resolution of the issues that the parties raise on review.

Plaintiff owns Section 20, Lot 1, which lies directly south of the lot that defendant owns, Section 17, Lot 4. The disputed property lies to the north of plaintiff's lot and to the west of defendant's. After considering the evidence in this case, the trial court made extensive, detailed findings of fact. On appeal, the parties asked the Court of Appeals to review some of the trial court's factual findings *de novo*. *Id.* at 645; *see* ORS 19.415(3) (giving the Court of Appeals discretion to review some equitable proceedings *de novo*). The Court of Appeals declined to do so and accepted the trial court's findings regarding accretion. *Sea River Properties, LLC*, 253 Or App at 645. We also accept the trial court's factual findings that are supported by the record and review its decision for errors of law. ORS 19.415(4).

In setting out the facts, we start by describing the geological history of the area, then explain how defendant and plaintiff came to own the property, and finally summarize the history of their legal dispute over it.

A. *Geological Background*

In the 1850s, the federal government surveyed coastal land in Oregon and platted the area by dividing it into sections. In this instance, each section was further divided into four lots, running north to south, from Lot 1 to Lot 4. Section 17, Lot 4's southern border is Section 20, Lot 1's northern border. In 1858, after the lots were first platted, their western border was the Pacific Ocean. At that time, the mouth of the Nehalem River lay slightly north of Section 17, Lot 4's northern border. Figure 1, set out below, depicts the location of the two lots and the Nehalem River in 1858.

Until the twentieth century, the Nehalem River continually alternated between two channels, a northern channel and a southern channel. In 1858, the river flowed through its northern channel. After 1858, over several decades, the river drifted, and by 1911, it had shifted into its southern channel. That gradual shift, as the trial court found, eroded significant portions of land along the coast, including almost all of Section 17, Lot 4. The trial court found that, by 1911, Section 17, Lot 4 had contracted into



**Figure 1: 1858. The Nehalem River
in its northern channel.**

a small, triangular piece of land (represented by the trian-
gle in Figure 2) on the eastern side of the Nehalem River's
southern channel. The trial court characterized that land in
1911 as "riverfront" property.[2]

---

[2] Maps portraying Section 17, Lot 4 in 1911 show the Nehalem River flowing
southward, with a small strip of tidelands to the east and a wider swath of tide-
lands fronting the Pacific Ocean to the west. At low tide, a tidal bar to the west of
the river sometimes emerged. At high tide, the ocean ordinarily covered it.



**Figure 2: 1911. The Nehalem River shifts to the south, eroding Section 17, Lot 4.**

By 1911, the Army Corps of Engineers began building two jetties to stop the river's drift and to keep it flowing in its northern channel, primarily to make the river safer for navigation. By 1926, the jetties were complete. The trial court found that, with the Nehalem River confined between the jetties to the north, the water in the southern channel "by some process undisclosed" in the record narrowed and dried up into a non-navigable stream, McMillan Creek, which flowed north to the Nehalem River. By that point, what little remained of Section 17, Lot 4 had as its western border the centerline of McMillan Creek (the former southern channel of the Nehalem).

From the 1920s until the 1990s, the ocean and winds deposited sediment along the upland of Section 20, Lot 1 until, gradually, new land began forming south of the Nehalem River's southern jetty. The new land grew by accretion north and northeast and gradually filled in portions that the Nehalem River had eroded before the 1920s.

The new land, which we and the parties refer to as the disputed property, "was non-contiguous with the property transferred to [defendant] by his predecessors in interest." The bed of McMillan Creek separates the disputed property from Section 17, Lot 4.[3] The disputed property (outlined by dashes in Figure 3) lies west of the center line of McMillan Creek (the Nehalem River's former southern channel), north of the section line, and just south of sandy beach along the Nehalem River's southern jetty.



**Figure 3: 2006. The configuration of the land
at the time of trial.**

B.   *Chain of Title*

In 1883, William Hiatt purchased from the state "all the tide lands lying west of and fronting and abutting upon Lots 2, 3, and 4 of Section 17." The trial court found that, in 1883, the only tidelands adjacent to and touching Section 17, Lot 4 were river tidelands on the eastern side of the Nehalem River's southern channel, where the river then flowed. In 1900, the State Land Board foreclosed on

---

[3] It appears from the record that the bed of McMillan Creek may be dry for parts of the year.

mortgages secured by, among other property, Section 17, Lot 4. In 1908, the State Land Board patented to Wright Blodgett Company (Wright) a plot of land that included Section 17, Lot 4.[4] In 1924, Wright conveyed Section 17, Lot 4 by warranty deed to one of defendant's predecessors in interest.[5] Wright also conveyed its "interest of, in and to tide lands fronting on" Lot 4 of Section 17 by quitclaim deed to the same predecessor in interest. In 1989, eight years after defendant purchased a vacation home in Nedonna Beach near the disputed property, defendant purchased Section 17, Lot 4, including "[a]ny and all tidelands fronting and abutting Government Lot 4, in Section 17."

Plaintiff's title traces back to Riley, who had purchased a 10-acre parcel that included Lots 1 and 2 of Section 20 in 1944 and subdivided the land for sale to several different purchasers. In 1996, Riley executed a deed conveying "all the natural accretions" to Lots 1 and 2 in Section 20 to a trust. In 1998, Riley sold those same accretions to a limited liability company, which later pledged the property as collateral for a loan on which the company defaulted. In 2005, after a foreclosure sale, plaintiff purchased by quitclaim deed "all the natural accretions" to Section 20, Lots 1 and 2.

## C.   *Procedural Background*

In 2006, plaintiff filed an action to quiet title to the disputed property, arguing that it owned the disputed property on the basis of its record title, accretion, or adverse possession. Defendant counterclaimed, asserting ownership on the same grounds.

Both the trial court and the Court of Appeals concluded that, because neither party's deed could be conclusively interpreted to include the disputed property, the law of accretion would determine the parties' property rights

---

[4] Alderman owned Section 17, Lot 4 when the state foreclosed on it. Although Hiatt may have transferred title to the tidelands fronting and abutting Lot 4 to Alderman, the state did not expressly foreclose on the tidelands separately from Lot 4. Similarly, the patent deed that the state later issued to Wright in 1908 included Section 17, Lot 4, but it did not refer to the tidelands.

[5] The trial court noted that the record does not contain a deed from Wright to defendant's one of predecessors in interest for Section 17, Lot 4. The parties do not dispute, however, that such a deed existed.

to it. In deciding the question of accretion, the trial court heard extensive expert testimony about the geological development of the area since 1858 and made detailed factual findings. It found that, when the Nehalem River shifted into its southern channel in the 1880s, it eroded large portions of upland along the coast, including most of Section 17, Lot 4. It further found that the process of erosion had permanently changed Section 17, Lot 4's western border: Where in the 1850s Section 17, Lot 4 had fronted the Pacific Ocean, by 1911 it fronted the Nehalem River and, as the southern channel of the Nehalem dried up and became a non-navigable creek, the western border of Section 17, Lot 4 went to the centerline of that creek. Finally, the trial court found that, after the federal government constructed the Nehalem River jetties, the disputed property formed by accretion, starting on Section 20, Lot 1 and growing northerly and northeasterly up the coastline toward the southern jetty.

The trial court ruled that, under Oregon law, accreted land belongs to the owner of the upland to which the accreted land first attaches. *See State Land Board v. Sause*, 217 Or 52, 82, 342 P2d 803 (1959) (stating that principle). It also identified a potential exception to that rule— the doctrine of lateral accretion. Under that doctrine, a trial court may divide accreted land when land grows laterally beyond a fixed property line such that it blocks one littoral or riparian landowner's access to water. *See, e.g.*, *Bonnett v. Division of State Lands,* 151 Or App 143, 152-53, 949 P2d 735 (1997) (discussing that doctrine).

Applying those rules to the facts, the trial court concluded that, because the accretion began along the upland of Section 20, Lot 1, the owners of that lot (plaintiff's predecessors in interest) took title to the disputed land. It also concluded that, because Section 17, Lot 4 did not border on the Pacific Ocean when the accretion began, the doctrine of lateral accretion did not apply to give defendant access to the Pacific. Ordinarily, those findings would have led to the conclusion that plaintiff's predecessors in interest acquired title to the disputed property as a result of accretion and that plaintiff, as a result of purchasing the natural accretions to Section 20, Lot 1, held title to the disputed property. The trial court, however, also found that defendant satisfied

the elements of adverse possession and thus acquired title to the disputed property that way. The trial court accordingly entered a judgment giving defendant title to the disputed property.

The Court of Appeals affirmed the trial court's judgment but on a different ground—namely, that defendant acquired title to the disputed property as a result of accretion. In reaching that conclusion, the Court of Appeals accepted the trial court's factual findings. However, it disagreed with the "conclusions that the [trial] court drew from those facts." *Sea River Properties, LLC*, 253 Or App at 651. The Court of Appeals explained initially that the law of accretion in Oregon is that "ownership of the land whereupon that new land was formed is the controlling consideration" in determining property rights to accreted land. *Id.* at 653. It found that either the state or defendant's predecessors in interest to Section 17, Lot 4 owned the tidelands over which the disputed property formed. *See id.* The Court of Appeals held that, because plaintiff's predecessors in interest did not own the tidelands on which the disputed land formed, the trial court erred in concluding that plaintiff's predecessors in interest took title to that land as a result of accretion. *Id.*

The Court of Appeals also found that "[t]he state had *** conveyed th[e] tidelands to [defendant's] predecessor" before the Nehalem eroded parts of Section 17, Lot 4 in 1911. *Id.* at 653. The court explained that it was "aware of no legal principle supporting the proposition that defendant's predecessors' ownership of those tidelands was lost merely because the river periodically came to divide them from the rest of Lot 4." *Id.* The court concluded that, because defendant's predecessors in interest retained the tidelands west of the Nehalem, the doctrine of lateral accretion gave them title to all accreted land lying above the southern boundary of Section 17, Lot 4 and west of that lot. *Id.* at 654 and n 4. Having held that defendant was entitled to the disputed property under the doctrine of lateral accretion, the Court of Appeals did not reach defendant's adverse possession claim.

We allowed plaintiff's petition for review to consider the principles that apply when land accretes on tideland and

also to consider the doctrine of lateral accretion, which this court has not previously recognized.

## II.   ACCRETION AND LATERAL ACCRETION

On review, the parties dispute primarily two issues regarding accretion. The first issue is whether, under Oregon law, accreted land belongs to the owner of the upland (plaintiff) to which the accreted land attached or whether it belongs to the owner of the tidelands over which the accreted land formed (arguably defendant).[6] The second issue is whether, even if the accreted land ordinarily would belong to plaintiff, the doctrine of lateral accretion requires that defendant get title to part of the accreted land to give him access to the Pacific Ocean.

We first explain the law of accretion in Oregon and how it applies to this case. We then consider defendant's argument that an equitable exception to the law of accretion (the doctrine of lateral accretion) applies in these circumstances.

### A.   *The Law of Accretion*

Accretion is a geological process by which new land forms when sand, silt, or soil is gradually and imperceptibly deposited on the edge of existing land.[7] Near tidal waters, existing land consists primarily of upland and tidelands. Upland is simply "land" in the ordinary sense of the word, lying beyond the farthest point that tidal water ordinarily reaches. *See Smith Tug v. Columbia-Pac. Towing Corp.*, 250 Or 612, 614, 443 P2d 205 (1968) (defining upland). It may front an ocean or lake (in which case, the land is described as "littoral") or a river or stream ("riparian"). *Darling v. Christensen,* 166 Or 17, 35, 109 P2d 585 (1941) (so defin-

---

[6] We say "arguably" because the parties disagree whether defendant owned the tidelands west of the Nehalem over which the accreted land formed.

[7] The conventional understanding of accretion is that it consists of two mechanisms, alluvion and reliction. Alluvion is a process by which sediment (also called alluvion) is gradually deposited onto the edge of upland, whereas reliction is a process by which land that was once submerged is uncovered by a gradual shift in the location of water. The legal principles controlling property rights to accreted land apply equally to both types of accretion. *See Hanson v. Thornton,* 91 Or 585, 590, 179 P 494 (1919); 1 *Water and Water Rights* § 6.03(b)(2) (Robert E. Beck & Amy K. Kelley, eds, 3d ed 2009).

ing those terms); *Black's Law Dictionary* 1018, 1441 (9th ed 2009). Tideland is submersible land "usually or ordinarily covered and uncovered every 24 hours by the action of the tides." *Sause*, 217 Or at 67. It lies between the line of ordinary high water (high waterline) and the line of ordinary low water (low waterline) of a tidal body of water. *See* ORS 274.005(8) (defining submersible land).[8]

In a typical case of accretion near tidal water, winds and tides gradually and imperceptibly deposit sand or other sediments onto the edge of upland contiguous to the shore.[9] Over decades, the deposits build up and combine into new land, pushing the boundary of the upland outward to the water. Because the upland portion of the area grows outward, and conversely, the high waterline moves seaward, the process of accretion necessarily pushes the boundaries of tidelands seaward as well. To put the point even more simply: Tidelands move. When new land accretes to existing upland, the high and low waterlines shift, and the tideland next to the upland moves seaward. Conversely, when land gradually erodes because a tidal water body or watercourse has shifted position, the upland recedes and the tidelands shift accordingly. *See generally Land Bd. v. Corvallis Sand & Gravel,* 283 Or 147, 161-62, 582 P2d 1352 (1978) (explaining that upland boundaries move with the high waterline).

Since antiquity, the rule of accretion has been that gradual and imperceptible additions of new land to existing upland become the property of the upland owner. *See, e.g.*, William Blackstone, 2 *Commentaries on the Laws of England* 262 (1765) (citing to Justinian's Institutes).[10] Our

---

[8] The line of ordinary high water is "the line on the bank or shore to which the high water ordinarily rises annually in season." ORS 274.005(3). The line of ordinary low water is "the line on the bank or shore to which the low water ordinarily recedes annually in season." ORS 274.005(4).

[9] The process of sudden and perceptible shifts in water bodies and water courses causing changes to land is called avulsion. Generally, avulsion does not change property rights. *See Sause,* 217 Or at 80; 1 *Water and Water Rights* § 6.03(b)(2).

[10] For a history of the doctrine of accretion, see Joseph L. Sax, *The Accretion/Avulsion Puzzle: Its Past Revealed, Its Future Proposed,* 23 Tul Envtl LJ 305, 313 (2010). Sax explains that the origins of the American understanding of accretion stem from Blackstone's account, which itself is based on the Abbot of Ramsey's case of 1369.

case law has frequently recognized and adhered to that principle. *Corvallis Sand & Gravel*, 283 Or at 161; *Purvine v. Hathaway*, 238 Or 60, 64-64, 393 P2d 181 (1964); *Sause*, 217 Or at 82; *Hoff v. Peninsula Drainage Dist.*, 172 Or 630, 638-39, 143 P2d 471 (1943); *State v. Imlah*, 135 Or 66, 74, 294 P 1046 (1931); *accord Hughes v. Washington*, 389 US 290, 293, 88 S Ct 438, 19 L Ed 2d 530 (1967).

In *Imlah*, for instance, the state sought to quiet title to accreted land in the Willamette River. *Imlah*, 135 Or at 67. The state claimed that an island had arisen in the middle of the river, the bed of which it owned, and that the disputed land had attached initially to the island and grown gradually towards the defendants' land on the western shore. *Id.* at 70. It followed, the state reasoned, that it owned the land that accreted between its island and defendants' land on the western shore. This court accepted the legal premise underlying the state's claim. It explained that "where an island arises in a stream, the title to the bed of which is in the state, [the island and any accreted land that attaches initially to the island] does not belong to the owner of either shore." *Id.* The court, however, explained that the state's premise did not match the trial court's factual findings, which were "that the accretions grew from the shore of the mainland and not from the island." *Id.* at 71. Because the accretions had attached initially to the defendants' property on the western shore and had grown outward into the river (and had not started on the island and grown toward the shore, as the state had argued), the accreted land belonged to the defendants. *Id.* at 74.

Another way of explaining the law of accretion is that, for littoral or riparian land, when the high waterline changes location because of accretion (moving the upland seaward), the property boundary moves with the water. *See Corvallis Sand & Gravel*, 283 Or at 161-62. Similarly, after erosion, when a waterway gradually changes positions with the effect of covering land and moving the upland edge landward, the property boundary also moves. *See id.* A riparian or littoral owner takes title to land that forms by accretion and loses title to land destroyed by erosion. *See Sause*, 217 Or at 82.

The policies underlying the rule of accretion stem primarily from two rationales. The first rationale is that accretion, because it occurs gradually and imperceptibly over long periods of time, is a small concern for most property owners. Most property owners barely notice such insignificant, slow changes, and it is more efficient to grant title to the contiguous landowner, who likely has the greatest interest in making the gradual additions useful, than to anyone else. *See Sause,* 217 Or at 79 (quoting Blackstone explaining that "in [accretion] cases the law is held to be, that if [the increase to land] be by little and little, by small and imperceptible degrees, it shall go to the owner of the land adjoining. For *de minimis non curat lex \* \* \**"). A second rationale is that riparian or littoral owners have a property interest in accessing the water that their land borders. *See Imlah*, 135 Or at 74. In most cases, when accretions extend from upland directly in front of riparian or littoral property, preserving access to that water favors giving the accreted land to the upland owner.

As our case law has established, the rule of accretion in Oregon (as well as elsewhere) is that accreted land belongs to the upland owner where the accretion began. If a party establishes that the accreted land first attached to his or her property, that party ordinarily takes title to it. In this case, the trial court heard extensive testimony and made detailed factual findings about the formation of the disputed land. Ultimately, it accepted plaintiff's expert's opinion that "the accreted property attached to Lot 1 in Section 20 and grew north and east" until it reached its current location west of Section 17, Lot 4 and south of the southern jetty. There is evidence to support those findings, and we accept them. Given those findings and the law of accretion, we hold that the trial court correctly concluded that, because the disputed property initially attached to Section 20, Lot 1 and grew northerly and northeasterly from that point, plaintiff's predecessors in interest took title to that property under the law of accretion.

Defendant's contrary argument starts from the premise that his predecessors in interest acquired title to the tidelands west of the Nehalem River in 1883 and that the

disputed property formed over those tidelands. Defendant argues that, because "the owner of submerged land is the owner of dry land that subsequently forms on it," the trial court should have held that he has title to the disputed property. Neither the premise nor the legal principle on which defendant's argument rests is well taken.

We begin with the premise of defendant's argument. In 1883, the state granted William Hiatt all the tidelands "lying west of and fronting and abutting" Lots 2, 3 and 4 in Section 17. Plaintiff does not dispute that that grant gave Hiatt (and through Hiatt, defendant) title to the tidelands adjacent to Section 17, Lot 4.[11] Defendant argues, however, that the state's deed to Hiatt also gave Hiatt title to the tidelands that lay on the other side of the Nehalem, which at the time of Hiatt's deed was a navigable river up to 600 feet wide and 26 feet deep. Defendant bases his argument on two phrases in the 1883 deed to Hiatt—"fronting and abutting" and "lying west of."

In interpreting a deed, a court must "ascertain and give effect to the intentions of the parties, as evidenced by the language of the instrument and the circumstances attending its execution." *Wirostek v. Johnson*, 266 Or 72, 75, 511 P2d 373 (1973). We start with the language of the 1883 deed. Ordinarily, a grant of tidelands that "front" a particular piece of property conveys title to the tidelands "in front of the lo[t] mentioned" and extends "to [the] low-water mark, wherever the same might be then or afterward." *Fellman v. Tidewater Mill Co.*, 78 Or 1, 7, 152 P 268 (1915). It does not convey title to the tidelands that lie on the other side of the river (or ocean). Were there any doubt about the matter, the word "abutting" removes it. A grant of tidelands "fronting and abutting" Lot 4 gave Hiatt only those tidelands that bordered on or were contiguous to Lot 4. *See Websters' Int'l*

---

[11] The record does not disclose a link between the title to the tidelands that the state deeded Hiatt in 1883 and Wright, one of defendant's predecessors in interest. It may be that, in foreclosing on Section 17, Lot 4 and later deeding that lot to Wright, the state inadvertently omitted a reference to the tidelands. Whatever the reason for the omission, we question whether defendant's title to the tidelands traces to the 1883 deed to Hiatt. It may trace only to the 1924 quitclaim deed that Wright gave one of defendant's predecessors in interest. Plaintiff, however, does not press the point, and we assume for the purposes of this case that defendant can base his claim to the tidelands on the 1883 deed to Hiatt

*Dictionary* 9 (1907) (defining abut as "to border" or "to be contiguous").[12]

Defendant also relies on the first part of the phrase in the 1883 deed to Hiatt, "all the tide lands lying west of" Lot 4. Defendant argues that we should give all the words in the deed effect and that, if the phrase "fronting and abutting" refers only to the tidelands that are adjacent to Lot 4, then "lying west of" Lot 4 must convey the tidelands on the other side (the western side) of the Nehalem. Otherwise, the phrase "lying west of" would be superfluous.

We note, as an initial matter, that the deed to Hiatt conveys the tidelands "lying west of" Lot 4. It does not convey the tidelands "lying west of" the Nehalem. In our view, the more natural reading of the entire phrase is the one that the trial court gave it—the phrase "all the tidelands lying west of and fronting and abutting" Lot 4 identifies three restrictions on the tidelands granted to Hiatt; that is, the tidelands granted to Hiatt lie west of Lot 4; they front that lot; and they abut it. Put differently, the phrase "fronting and abutting" defines which tidelands to the west of Lot 4 Hiatt took.

Although the trial court's reading of the 1883 deed is the more natural one, its reading does make the phrase "lying west of" superfluous, as defendant reasons. Because some ambiguity inheres in the text, we accordingly consider the circumstances surrounding the execution of the 1883 deed. *See Wirostek*, 266 Or at 75 (noting that consideration). As defendant notes, the state granted the 1883 deed to Hiatt

_____

[12] Defendant argues that *Fellman* is consistent with his claim that a grant of tidelands "fronting and abutting" his property conveyed not only the tidelands adjacent to his property but also the tidelands on the other side of the river. Defendant misperceives both the issue in *Fellman* and what that case held. The defendant in *Fellman* argued that a grant of tidelands fronting or abutting a particular property gave the grantee only the "metes and bounds described in the survey of the tide-lands as they then were" and that tidelands granted in that way did not move as the upland moved. 78 Or at 6. The court rejected that argument and held that "[t]he rule is that the purchaser of tide-land takes to the low-water mark, that afterward he is entitled to follow that line to the utmost of its recession, and that he acquires title to the accretions which gradually form upon his original grant." *Id.* at 7. *Fellman* neither held nor suggested that a grant of tidelands fronting and abutting property on one side of a river grants tidelands on the other side of the river.

pursuant to the 1872 Tide Lands Act. *See* Or Laws 1872, p 129, as amended by Or Laws 1874, p 76. A stated purpose of that act was to encourage the owners of "soil abutting upon the coast" and tidal rivers to build structures to prevent the "washing away [of] the shores and [the] shoaling [of] such bays, harbors, and inlets." Or Laws 1872, p 130 (reciting one purpose of the act). The act gave the owners of "any land abutting or fronting upon or bounded by" tidal waters the right to purchase from the state the tidelands "in front of" their land. *Id.* § 1. With one exception, the act required an applicant seeking to purchase tidelands to provide proof that he or she held "title to land which abuts or fronts upon or is bounded by such tide lands" before the state could sell those tidelands to the applicant. *Id.* § 3.[13]

Viewed against that backdrop, the meaning of the state's 1883 deed to Hiatt becomes clear. The 1872 act authorized the state to sell tidelands to persons whose land "abuts or fronts upon or is bounded by" those tidelands. That authorization confirms the natural interpretation of the language in the 1883 deed to Hiatt: The tidelands that the state conveyed to Hiatt were the tidelands that abutted or fronted and bounded Lot 4. Those were the tidelands on the eastern side of the southern channel of the Nehalem. Hiatt (and Hiatt's successors in interest) did not take title to the tidelands on the other side of the river. As the trial court found, when the Nehalem later shifted to its northern channel and the southern channel became a non-navigable creek, the title to the tidelands that defendant and his predecessors obtained from Hiatt stopped at the thread or center of that creek. *See Kingsley v. Jacobs*, 174 Or 514, 523, 149 P2d 950 (1944).[14] Defendant's title does not extend any farther west.

---

[13] Section (5) of the 1872 act stated the exception. It provided that, if the adjacent landowner had not applied to purchase the tidelands within a year after the passage of that act, then the tidelands could be purchased by other Oregon residents. Two years later, the legislature amended section (5) to provide that, if anyone other than the owner of the adjacent land sought to purchase tidelands, notice must be given to the landowner adjacent to the tidelands and that, if the adjacent landowner applied to purchase the tidelands, the adjacent landowner would be given preference. Or Laws 1874, pp 77-78.

[14] When a party owns the tidelands contiguous to a navigable tidal river, that party owns to the ordinary low waterline. If the river becomes non-navigable, that party owns to the center or thread of the non-navigable stream. *See Kingsley*, 174 Or at 523.

It follows that the premise of defendant's claim to the disputed property fails. If defendant or his predecessors in interest did not hold title to the tidelands west of the Nehalem, then we need not decide the correctness of the legal proposition that defendant advances—that the owner of tidelands on which dry land forms owns that land—to decide *defendant*'s claim to the disputed property. Plaintiff, however, also asserts that it owns the disputed property as a result of accretion, and the Court of Appeals accepted the legal proposition that defendant advances here in concluding that plaintiff did not acquire title to the disputed property. To determine whether the trial court correctly ruled otherwise, we consider briefly the merits of the legal argument that defendant advances.

Defendant cites a United States Supreme Court decision and an Oregon Court of Appeals decision to support the proposition that "the owner of submerged land is the owner of dry land that subsequently forms on it." The legal principle on which defendant relies is correct insofar as it applies to islands, sand bars, and other dry lands that emerge from water unconnected to other dry land. But neither case on which defendant relies goes further than that. In the first case, the United States Supreme Court recognized that dry land (an island) that formed in the middle of a river unconnected to the shore belonged to the owner of the submerged land on which the island formed. *St. Louis v. Rutz*, 138 US 226, 245, 11 S Ct 337, 34 L Ed 941 (1891) (applying Illinois law). The Court also recognized that accreted land that attached to the island belonged to the owner of the island. *Id.* at 247. The Court neither held nor suggested that land that attaches initially to upland and forms over tideland belongs to the owner of the tideland. The rule that defendant asks us to draw from *Rutz* is contrary to well-established principles of accretion; nothing suggests that the Court departed from those principles in *Rutz*.

The second case is to the same effect. In *Bonnett*, a spit of land formed from a northern lot called "Northpoint" and grew southward down the Siuslaw River's main channel

in front of plaintiff's lot.[15] 151 Or App at 147-79. Starting from the spit, land accreted and grew east toward plaintiff's lot, eventually attaching to it. *Id.* The issue in *Bonnett* was whether the plaintiff owned the newly formed land that attached to his lot. The court came to two conclusions. First, it concluded that someone other than the plaintiff owned the tip of the spit where the accreted land formed. *Id.* at 150. To support that determination, it reasoned that it was most sensible to treat the spit as if it were an island (a "spit island") that arose on the tidelands across the channel from plaintiff's lot. *Id.* at 153. Because "the owner in fee of the bed of a river, or other submerged land, is the owner of any bar, island or dry land which subsequently may be formed thereon," *see Rutz*, 138 US at 247, the Court of Appeals assumed that the owner of the "spit island" ordinarily would be the State of Oregon. *Bonnett*, 151 Or App at 153. Second, it concluded that, because the accretions had started on that "spit island," the accretions belonged to whoever owned the spit island, and that person was not the plaintiff. *Id*.

Put another way, the court in *Bonnett* applied two sets of principles. One set pertained to the ownership of islands, tidal bars, and elevations that form *within* tidelands, unattached initially to any land on the shore. The other set controlled ownership of land that forms by attaching to upland through accretion and grows outward, pushing the boundaries of the tideland with it. The principles relating to islands and sand bars were relevant because, to decide who takes title to land formed by accretions, the court first had to determine who owned the property (in *Bonnett*, the spit island) where the accretions began.

Neither set of principles helps defendant in this case. Rather, the first set makes clear that the principle that defendant invokes here—that the owner of submerged land is the owner of dry land that subsequently forms on it—is limited to islands, sand bars, and the like that arise in the midst of a body of water, unconnected initially to any

---

[15] Of course, neither the United States Supreme Court's application of Illinois law in *Rutz* nor the Court of Appeals' interpretation of Oregon law in *Bonnett* controls our resolution of Oregon law here. We consider those cases for their persuasive value only.

dry land. The second set confirms that plaintiff owns the disputed property, which attached to Section 20, Lot 1 and grew north and east by accretion. Far from advancing defendant's argument, the reasoning in *Bonnett* undercuts it.

Indeed, the principle on which defendant's tideland-ownership reasoning relies is at odds with the method that Oregon courts and other courts have used to determine property rights to accreted land. If defendant were correct, instead of identifying the upland to which the accreted land attached and who owns the upland, as in *Imlah* or *Bonnett*, courts would look simply to who owned the underlying tidelands, riverbed, or lake floor. In most instances, the state would own it, and, if defendant's rule were correct, the state would take a large portion of accretions to littoral and riparian land. As our cases show, however, that is not the rule in Oregon. The controlling principle is that the upland owner takes accretions that began forming on the upland. Applying that principle to the trial court's factual findings, we agree with the trial court that plaintiff acquired title to the disputed property as a result of accretion.

B.  *Lateral Accretion*

Ordinarily, under the law of accretion, an upland owner takes accretions to his or her upland without qualification. Defendant, however, argues that an exception to the rule of accretion—called lateral accretion—provides a second ground for quieting title in his favor. That exception applies when land accretes to one owner's property and then extends laterally in front of another owner's property, blocking that owner's access to water. In those instances, some courts have recognized that one of the purposes that underlies the doctrine of accretion—preserving access to water—is frustrated. *See Lamprey v. Metcalf*, 52 Minn 181, 197, 53 NW 1139 (1893) (noting the "incalculable mischiefs that would follow if a riparian owner is liable to be cut off from access to the water, and another owner sandwiched in between him and it"). To avoid the inequity in allowing one landowner's right to the accretions that attached to his land to cut off an adjoining landowner's access to water, lateral accretion emerged as a doctrine that allows courts to apportion accreted land among multiple property owners.

This court has never recognized the doctrine of lateral accretion. Two cases from other states, however, illustrate the doctrine. In the first case, the plaintiff owned a plot of land along the inlet of a lake. *Rondesvedt v. Running*, 19 Wis 2d 614, 615, 121 NW2d 1 (1963). The water directly in front of the property was shallow—about a foot deep—and beyond that shallow water lay the deeper water of the lake. *Id*. Ordinarily, the plaintiff could walk through the shallow water to the deeper water. *Id*. at 620. Over a long period of time, however, land accreted to her neighbor's property and created a small strip between the shallows directly in front of her property and the deeper water beyond it. *Id*. The result was that the plaintiff could no longer get to the deeper water in the lake without crossing the small strip of dry land now connected to her neighbor's land. *Id*.

The plaintiff argued that, even though the strip had accreted to her neighbor's land, she should take title to the part that obstructed her access to the lake. The Wisconsin Supreme Court agreed. *Id*. at 620. It reasoned:

> "[The plaintiff's lot] before the accretion occurred, had access to the open water of the lake by traversing the shallows in a direct line from any portion of her shore. She may still reach open water, but because of the process of accretion may not do so by water in a direct line from all parts of her shore."

*Id*. The court accordingly apportioned the accreted land as the plaintiff had requested. *Id*. at 621.

Similarly, in the second case, a "highly unusual accretion" formed at the mouth of the Copalis River on the coast in central Washington. *Hudson House, Inc. v. Rozman*, 82 Wash 2d 178, 179, 509 P2d 992 (1973). The accretion started from land south of a Washington State park and extended northerly up the coast into a long spit between the Copalis River to the east and the Pacific Ocean to the west, blocking the "ocean frontage" that the park previously had enjoyed. *Id*. at 178-81. As the court explained, the park "once had frontage directly on the Pacific Ocean, but the growth of the accretion has come between the park and the ocean." *Id*. at 181. To maintain the park's access to the ocean, the court invoked the doctrine of lateral accretion and apportioned the

accreted land. *Id.* at 181, 184; *see also Waring v. Stinchcomb*, 141 Md 569, 119 A 336 (1922) (apportioning land where accreted land simultaneously changed the course of the outlet channel of a river and blocked access to the Chesapeake Bay for an owner whose property, before the accretion, was contiguous to the Bay).

We draw two separate but related principles from those cases. First, the doctrine of lateral accretion applies when the accreted land that ordinarily would belong to one landowner cuts off an adjoining landowner's access to a body of water. Second, in that circumstance, some courts divide the accreted land to permit the adjoining landowner to maintain access to that body of water.

In this case, even if we were to recognize the doctrine of lateral accretion, defendant's invocation of the doctrine fails to satisfy those prerequisites. Specifically, defendant invokes the doctrine of lateral accretion to obtain access to the Pacific Ocean. However, as the trial court found, the formation of the disputed property, which began in the 1920s, did not cut off defendant's land from the Pacific. Rather, defendant's land no longer bordered on the Pacific, as a result of a shift in the Nehalem and the consequent erosion of Section 17, Lot 4, some 40 years earlier. Indeed, when the disputed property began forming in the 1920s, Section 17, Lot 4 bordered only on the Nehalem, which access that lot still enjoys.[16] Defendant fails to explain how the doctrine of lateral accretion permits a court to divide the disputed property so that he can obtain land fronting the Pacific Ocean when the formation of the disputed property was not the event that caused him to lose access to the Pacific in the first place. Even if we were to recognize the doctrine of lateral accretion, and we need not do so to resolve defendant's lateral accretion claim, defendant provides no reason to think that equity permits him to parlay river frontage into ocean frontage.

Defendant advances two arguments in support of a different conclusion. He argues initially that not only did the

---

[16] Referring to a 2005 map, plaintiff states in its brief on merits "that the portion of Lot 4 with tidelands fronting and abutting it still has access to the Nehalem River over the river tidelands, as was the case in 1911." In defendant's brief on the merits, he does not take issue with that statement.

Pacific Ocean form the western border of Section 17, Lot 4, in 1858, but also that the Pacific remained the western border of Lot 4 when the process of accretion that formed the disputed property began in the 1920s.[17] Defendant's argument is at odds with the trial court's factual findings regarding the Nehalem's shift to its southern channel in the 1880s and the resulting erosion (and permanent loss) of much of Lot 4. The record supports the trial court's findings, which effectively dispose of defendant's first argument.

Defendant argues alternatively that, even if the Nehalem fronted his property in the 1920s when the accretion to Section 20, Lot 1 began, the same situation was true in both *Hudson House* and *Bonnett*. He reasons that, in those cases, a navigable river lay between the riparian owner's property and the ocean. He argues that, because neither case "treated the navigable river channel as cutting off the riparian owner's littoral rights to the Pacific," we should not do so here.

We read those cases differently. In *Hudson House*, the court explained that the state park "once had frontage directly on the Pacific Ocean, but the growth of the accretion has come between the park and the ocean." 82 Wash 2d at 181. Put differently, the process of accretion was the cause of the park's loss of ocean frontage, and the court accordingly exercised its equitable power to divide the accreted land between the park and the party that otherwise would have acquired title to all the accreted land. In this case, the trial court found that the process of accretion that gave rise to the disputed property was not the cause of Lot 4's loss of ocean frontage. That loss occurred approximately 40 years before the disputed property began accreting to Section 20, Lot 1.

---

[17] Defendant argues that erosion "is the result of the body of water that borders the property cutting into the former upland." He contends that, because the Pacific Ocean bordered Section 17, Lot 4 in the 1850s, only the Pacific Ocean could have caused the erosion that changed the shape and size of Section 17, Lot 4 by the early twentieth century. In support of that position, defendant cites *Sause*, 217 Or at 69. We find no support there, or in any other case, for so limited an understanding of erosion. The trial court found that the Nehalem River caused the erosion in this case and that, because of the erosion, Section 17, Lot 4 ceased bordering the Pacific Ocean. We conclude that those findings do not arise from any error of law or misunderstanding of the principles underlying erosion.

Similarly, in *Bonnett*, it was the growth of what the court referred to as a "spit island" and the accretion that attached to that island that deprived the plaintiff's land of ocean access. *See* 151 Or App at 151. In that respect, *Bonnett* is like *Hudson House* and different from this case. Neither case provides a basis for saying that equity permits a court to divide accreted land to preserve access to a body of water when the process of accretion did not cause the loss of access. Because the factual predicates for apportioning the disputed property under the doctrine of lateral accretion are not present here, we need not recognize that doctrine to decide this case. It suffices to hold that the doctrine, as other courts have articulated it, does not apply to these facts.[18]

We reaffirm that, in Oregon, land formed by accretion to upland belongs to the owner of the upland where the accretion began. We also hold that the doctrine of lateral accretion, even if we were to recognize it, does not apply here. Accepting the trial court's findings, we hold that plaintiff's predecessors in interest, and plaintiff through them, took title to the disputed property as a result of the law of accretion.

## III.   ADVERSE POSSESSION

Because we agree with the trial court that plaintiff's predecessors in interest acquired title to the accreted property, the remaining question is whether defendant later acquired title to that property by adverse possession. In considering that issue, we refer to the accreted property as "plaintiff's property." Doing so more accurately frames the question whether defendant's use of plaintiff's property is sufficient to establish that he adversely possessed it.

We begin by identifying the elements necessary to prove an adverse possession claim. At common law, to succeed on an adverse possession claim, a claimant had to prove, by clear and convincing evidence, six elements: "that the use of the property was actual, open, notorious, exclusive, continuous, and hostile for a 10-year period." *Hoffman v. Freeman Land and Timber, LLC.*, 329 Or 554, 559, 994 P2d

---

[18] Similarly, we do not consider a subsidiary issue that the parties raise—how, if the doctrine of lateral accretion applied, the disputed property should be apportioned between plaintiff and defendant. Defendant urges us to follow *dicta* in *Bonnett*; plaintiff argues that that *dicta* runs counter to the majority rule in states recognizing the doctrine of lateral accretion.

106 (1999). In 1989, the Oregon legislature codified those six common-law elements and added one more—a person claiming adverse possession must have an honest belief throughout the 10-year period that he or she is the actual owner. *See* Or Laws 1989, ch 1069, § 1 (enacting ORS 105.620).[19]

In this case, plaintiff concedes that defendant's use of the property was open, notorious, and hostile. Plaintiff argues, however, the evidence does not establish actual, continuous, and exclusive use for a 10-year period, nor does it establish, plaintiff contends, that defendant reasonably had an honest belief that he owned the property. In analyzing plaintiff's argument, we accept the trial court's findings of historical fact that are supported by the evidence.[20] Whether those historical facts establish the elements of an adverse possession claim presents a legal issue. *See Hoffman*, 329 Or at 564.[21] Applying that standard of review, we set out the historical facts consistently with the trial court's findings.

---

[19] ORS 105.620 provides:

"(1) A person may acquire fee simple title to real property by adverse possession only if:

"(a) The person and the predecessors in interest of the person have maintained actual, open, notorious, exclusive, hostile and continuous possession of the property for a period of 10 years;

"(b) At the time the person claiming by adverse possession or the person's predecessors in interest, first entered into possession of the property, the person entering into possession had the honest belief that the person was the actual owner of the property and that belief:

"(A) By the person and the person's predecessor in interest, continued throughout the vesting period;

"(B) Had an objective basis; and

"(C) Was reasonable under the particular circumstances; and

"(c) The person proves each of the elements set out in this section by clear and convincing evidence."

[20] Although we have discretion to review the trial court's factual findings *de novo*, ORS 19.415(4), we decline to exercise that discretion and accept the trial court's findings of historical fact that are supported by the evidence, as we did in considering the parties' competing accretion claims.

[21] In *Hoffman*, this court "accept[ed] the facts as found by the Court of Appeals and limit[ed] our review to questions of law." *Id.* at 556. This court then ruled that, contrary to the Court of Appeals conclusion on one of the elements, the historical facts were not "significant enough" to establish hostility. *Id.* at 564. Rather, this court concluded that the historical facts "tip[ped] the scales" the other way on hostility. *Id.* Following *Hoffman*, we conclude that the question whether the historical facts are "significant enough" to establish actual, continuous, and exclusive use presents a legal issue for appellate courts.

In 1981, defendant bought a vacation house in Nedonna Beach. Defendant's beach house is near Section 17, Lot 4 and plaintiff's property, but it is not located on either parcel of land. Defendant's son testified that, after his father bought the beach house in 1981, the son and the son's daughter "stayed there quite a bit." They generally went there during "vacation times, the summertime, or weekends" because, at that time, the son's daughter was in school. Initially, they visited the beach house "maybe five to eight times" a year. As his daughter got older, they visited the beach house "maybe two, three times a year," and the son visited there "once or twice a year" on his own and then "off and on" up to the time of trial. When the son and his daughter visited the beach house, they would walk along the trails on plaintiff's property or along the jetty, which lies outside plaintiff's property. They also had "several wiener/marshmellow roasts against the jetty," and defendant's son did "some fishing off the jetty."

Defendant testified that, after he bought the beach house in 1981, he visited the house "quite a bit. [He] would go down there weekends, especially in the summertime, and even in the wintertime." His visits were "quite frequent the first few years [he] had the house." During that time, he used plaintiff's property "for recreation," which consisted of "going along the trails" and "walk[ing] out to the jetty from time to time."

Eight years later, in 1989, defendant purchased Section 17, Lot 4. The real estate agent represented and defendant understood (inaccurately as it turns out) that Section 17, Lot 4, included the property that we have determined belongs to plaintiff. After defendant purchased Section 17, Lot 4, he "continue[d] using [plaintiff's property] for recreational purposes." Defendant also gathered firewood on plaintiff's property and once improved "one of the roads [on plaintiff's property] a little bit" by "cut[ting] some branches that had grown into the roadway." He cut the branches "so [he] could get [his] truck back there and get firewood."

Defendant did not testify how frequently, after 1989, he visited his beach house and walked over plaintiff's property.

In 2001 or 2002, defendant left Oregon "to move and establish a business in Las Vegas."

When asked whether other people in the Nedonna Beach area also used plaintiff's property for recreational purposes, defendant answered, "All the time." He explained that "some of them have camped there, and some of them just walk the trails." Defendant testified that he has "seen trailers parked on the property, and [he has] seen guys go back, especially [on holidays], and they camp back there someplace." Defendant's testimony on that point was consistent with the evidence from other witnesses, who testified to the public's use of plaintiff's property for recreational purposes.

After defendant bought Section 17, Lot 4 in 1989, the county tax records erroneously described plaintiff's property as belonging to defendant. Defendant accordingly has paid taxes on the value of that land. Additionally, he granted two public bodies easements over plaintiff's property (one in 1995 and the other in 2000). He also entered into an agreement in 1998 with a third public body permitting it to cut brush to preserve a sight line. We discuss those agreements in greater detail below.

After considering that evidence, the trial court found that defendant "has continuously claimed ownership of [plaintiff's] property." The court concluded:

"There is *** clear and convincing evidence that [defendant] made actual use of the property. Actual use is established if a claimant establishes a use of the land that would be made by an owner of the same type of land, taking into account the uses for which the land is suited. [Defendant] granted easements to parts of the property to third parties and granted other and third parties access to the property. He engaged in litigation to protect his interest in the property. He rejected [plaintiff's predecessor in interest's] claims of ownership and offers of compromise. He was shown as record owner of the property. He paid property taxes on the property."

The trial court did not separately address each element—actual, continuous, exclusive, hostile, open, and notorious use—necessary to establish adverse possession. Nor did

it identify a specific 10-year period in which it concluded that those aspects of defendant's use coalesced. Rather, it appears to have concluded that defendant acquired title to plaintiff's property by adverse possession based primarily on defendant's claim of ownership, his payment of taxes, the two easements he granted to the public bodies, and the permission he gave another public body to cut brush to maintain a sight line.

On appeal and review, plaintiff has conceded that the evidence establishes that defendant's use of its property was open, notorious, and hostile. Plaintiff argues, however, that defendant failed to establish actual, exclusive, and continuous use of the property for a 10-year period.[22]

We take the last point first. To acquire title by adverse possession, defendant had to prove by clear and convincing evidence that all the elements necessary to establish adverse possession existed for a single 10-year period. ORS 105.620(1)(a); *Hoffman*, 329 Or at 559. In this case, however, defendant has never identified one 10-year period in which those elements coalesced. Plaintiff, for its part, has argued that the 10-year period must begin sometime after defendant purchased Section 17, Lot 4 in 1989, and defendant has not explained on appeal or review why plaintiff's argument is incorrect.[23] We accordingly consider only the roughly 21-year period from 1989 (when defendant purchased Section 17, Lot 4) to May 14, 2010 (when defendant first asserted a counterclaim for adverse possession).

---

[22] Plaintiff also argues that the evidence does not establish that defendant's belief that he owned the property was reasonable. We need not resolve that issue because we conclude that the evidence does not establish actual, continuous, and exclusive use.

[23] In its opening brief in the Court of Appeals, plaintiff argued that "[defendant] cannot rely on Publishers [defendant's immediate predecessor in interest] to complete his adverse possession claim." Plaintiff reasoned that defendant could tack to a period of time during which Publishers owned Section 17, Lot 4 only if defendant established that Publishers' use of plaintiff's property during that period satisfied all the elements necessary to prove an adverse possession claim. Plaintiff argued that defendant had not done so. Defendant has not explained in the briefs that he filed on appeal and review why plaintiff is wrong on that point, although he recited that Publishers had leased land to the City of Rockaway Beach and had given a license to the city. At one point during oral argument, defendant's attorney stated in passing that defendant should be able to tack to Publishers' use, but he did not explain why Publishers' use was sufficient for it to adversely possess against plaintiff's predecessor in interest.

*See Real Estate Co. v. Hendrix*, 28 Or 485, 496, 42 P 514 (1895) (considering whether the elements necessary to prove adverse possession had been established "for a period of more than ten years immediately preceding the commencement of this suit").

Within that 21-year period, defendant still does not identify which 10-year period he believes establishes his adverse possession claim. The omission is problematic. As explained below, defendant identifies essentially three categories of use that, in his view, establish his actual, continuous, and exclusive use of plaintiff's property. However, not all those uses have occurred continuously from 1989 to 2010. Some did not start until the latter part of that 21-year period. Other uses may have occurred with greater frequency in 1989 but have diminished as time passed. In determining whether any or all of those uses are sufficient to prove actual, continuous, and exclusive use, the question is whether a sufficient combination of those uses occurred within a single 10-year period. With that temporal focus in mind, we turn to defendant's arguments.

As we understand defendant's argument, he identifies essentially three categories of use: (1) paying taxes on plaintiff's property since 1989; (2) using plaintiff's property for recreational purposes; and (3) granting two easements and giving a third party access to plaintiff's property. We begin with defendant's payment of taxes.

Paying taxes to a county tax collector is not an actual use of land. Rather, it is an act that manifests a claim of ownership, as this court has recognized for more than 100 years. In *Real Estate Co.*, for example, the plaintiff's immediate predecessor in interest had acquired title to a 140-acre tract of land, platted the land as the town of Cornelius, and then sold part of the land to the plaintiff in 1872. 28 Or at 490, 496. From 1872 until 1891, the plaintiff "appointed persons living at Cornelius to act as its agent [and] paid the taxes annually assessed on the property most of the time ***." *Id.* at 496. When it turned out that the plaintiff's predecessors in interest had not acquired good title to the land, the plaintiff argued that it had acquired title to it by adverse possession. *Id.*

This court held that the plaintiff had failed to establish sufficient actual occupancy or use of the land to prove adverse possession. As the court recognized, "[i]t must be admitted that the plaintiff claimed title to the *locus in quo*." *Id.* at 497.[24] The court explained, however, that "never having occupied any portion of the premises, [the plaintiff's] claim of ownership, in the absence of occupancy, can never become the foundation of an adverse right." *Id.* at 497. The court reasoned that to establish that it had occupied the land, the plaintiff would have show actual possession of the land. *Id.*

Since *Real Estate Co.*, this court has viewed payment of taxes as "substantial evidence of claim of ownership," while reaffirming that "payment of taxes alone" is not sufficient to prove actual possession or actual use of the land. *Knecht v. Spake*, 218 Or 601, 607-08, 612, 346 P2d 98 (1959). The court accordingly has required proof of actual, open, notorious, exclusive, continuous, and hostile use to establish an adverse possession claim. *Id.* at 609-10. Following *Real Estate Co.* and *Knecht*, we conclude that defendant's payment of taxes on plaintiff's property established a claim of ownership, but it does not establish defendant's actual, continuous, or exclusive use. Defendant must establish that use some other way. *See Real Estate Co.*, 28 Or at 497. We turn to the two remaining "uses" that defendant has identified.

Defendant argues that his family's use of plaintiff's property for recreational purposes after 1989 establishes actual, continuous, and exclusive use. As noted, defendant testified that his visits to his beach house were "quite frequent" for the first few years after he bought the beach house in 1981. The record, however, does not disclose how frequently or infrequently defendant visited the beach house or walked over plaintiff's property after 1989, when he bought Section 17, Lot 4. Similarly, defendant's son testified that he and his daughter visited the beach house five to eight times a year after his father bought the house in 1981. As the daughter grew older, however, their visits diminished

---

[24] The court did not specify which acts gave rise to the plaintiff's claim of ownership. However, it had noted that the plaintiff had paid taxes on the land since 1872.

to "maybe two, three times a year," and the son visited the beach house once or twice a year on his own. On those occasions when defendant or his family would visit the beach house after 1989, they would walk on the trails over plaintiff's property to the ocean or back to the jetty.

We assume that defendant and his family's recreational use of plaintiff's property after 1989 constituted "actual use." We question whether their occasional use established "continuous" use for a 10-year period. We recognize that whether an adverse possessor uses land continuously will vary with the nature of the land. *See Allison v. Shepherd*, 285 Or 447, 452, 591 P2d 735 (1979) ("An adverse possessor need only establish an occupation or use of the land that would be made by an owner of the same type of land, taking into account the uses for which the land is suited."). However, because defendant and his family never testified how frequently they visited the area or walked over plaintiff's property after 1989, it becomes more difficult to say that defendant has proved, by clear and convincing evidence, "continuous" use of plaintiff's property for a 10-year period.

Even if, however, defendant and his family's recreational use of plaintiff's property were continuous, their use was not exclusive. As noted, plaintiff's property consists of approximately 40 acres of undeveloped grassy beach on which a stand of trees and other flora grow near a small creek. Like the other coastal land nearby, it is a natural place for walking or picnicking. After testifying that he explored the trails on plaintiff's property on those occasions when he visited his beach house, defendant explained that other visitors to Nedonna Beach also used plaintiff's property for recreational purposes "[a]ll the time." As defendant testified, other people routinely camped on plaintiff's property, parked their trailers there, and went back on the trails that cross the property.

When, as in this case, defendant and his family's use of plaintiff's property is the same as or similar to other families' use of that property, their use was not exclusive. Indeed, this case is difficult to distinguish from *Fry v. Woodward*, 221 Or 39, 350 P2d 183 (1960). In that case, the land was

"low land, with brush, trees, and berry bushes" and remained unimproved except for a single fence. *Id.* at 41. The area was "largely used for picnics, swimming and fishing by all adjacent neighbors and the public generally." *Id.* at 42. For that reason, among others, the court concluded that defendants' use was "far from exclusive," inasmuch as it "appear[ed] to have been in common with every one else." *Id.* at 44.[25]

Because defendant and his family's recreational use of plaintiff's property is not sufficient to establish actual, continuous, and exclusive use for a 10-year period, we also consider the other category of "use" that defendant has identified—three agreements with local governmental bodies. In 1995, defendant granted an easement to the City of Rockaway for two backup wells and a related waterline that are situated on plaintiff's property. In 1998, he agreed to permit the Port of Nehalem to cut brush to maintain a sight line. Finally, in 2000, he granted an easement to the Tillamook Peoples Utility District for an underground utility line just north of Section Line Road.

Defendant's agreements with those local governmental bodies are relevant to his adverse possession claim in one respect. The act of entering into each agreement is a one-time manifestation of a claim of ownership, similar to payment of property tax. None of those acts, however, evidences *defendant's* actual occupation or actual use of plaintiff's property. Rather, they reflect his authorization for someone else to use plaintiff's property. Perhaps recognizing that difficulty, defendant argues that the city, the utility district, and the port's subsequent use of plaintiff's property is attributable to him. That is, he argues that the city,

---

[25] Defendant also relies on the fact that, when he visited his beach house, he would gather firewood on plaintiff's property and that once he "cut some branches that had grown into the roadway" on plaintiff's land "so [he] could get [his] truck back there and get firewood." Not only does a single instance of cutting some branches to maintain a road not establish continuous use, but occasionally gathering firewood on undeveloped land that the public routinely uses for recreational uses is not a sufficiently distinct use to be exclusive. *See Hamilton v. Flournoy*, 44 Or 97, 102, 74 P 483 (1903) (engaging in the same uses as others did not constitute actual and exclusive use); *cf. Wheeler v. Taylor*, 32 Or 421, 436, 52 P 183 (1898) (explaining that "occasionally cutting and carrying away rails and firewood from land chiefly valuable for timber was not such an open, notorious and continuous occupancy as would give title" under an adverse possession claim).

the utility district, and the port's use of plaintiff's property establishes *his* actual, continuous, and exclusive use of it. In considering that argument, we begin with the easements he granted the city and the utility district.

This court has long recognized that a principal can base an adverse possession claim on his or her agent's use of land. *Springer v. Durrette*, 217 Or 196, 203, 342 P2d 132 (1959). An agent acts on the principal's behalf, and the agent's acts are attributable to the principal for the purpose of an adverse possession claim. *See id.* In this case, however, the utility district and the city were not defendant's agents, nor were they even his lessees. Rather, defendant granted the utility district and the city a property interest (an easement) in plaintiff's property that, once granted, the utility and the city owned. It is difficult to see how, having divested himself of an interest in property, defendant can rely on a subsequent owner's use of that property interest to establish his own use.

To put the point a different way, if the utility district and the city wanted to bring an adverse possession claim against plaintiff, the utility district and the city could perhaps tack to defendant's use. However, defendant cannot tack to their use. Having divested himself of an interest in the property, defendant cannot rely on the subsequent owner's use to establish his use. *Cf. Riverwood Commercial Properties, Inc. v. Cole*, 138 NH 333, 336, 639 A2d 714 (1994) (holding that granting various easements was insufficient as a matter of law to establish the grantor's adverse possession claim); *State v. Heard*, 199 SW2d 191, 195 (Tex Civ App 1946), *aff'd*, 146 Tex 139, 204 SW2d 344 (1947) (rejecting an argument that an asserted easement over another's land gave rise to an adverse possession claim).[26]

---

[26] We note that, from 1989 to 1995, defendant was the apparent successor in interest to a lease and a license that Publishers Paper had given the city for two backup wells and a related waterline that were on the property. As a result of disputes with the city, defendant ordered the city to "cease and desist" its activities on the property in 1993 and brought a trespass action against the city in 1994. Even if defendant could rely on the city's use of the property as his lessee from 1989 to 1995 to establish his own use, he still faces at least two difficulties. That use does not establish use for a 10-year period. Moreover, defendant told the city that it had no right to be on the property and sued it for trespass, actions that are difficult to reconcile with his reliance on the city's use.

Defendant also signed an agreement with the Port of Nehalem on June 6, 1998, which gave the port the right to cut brush to keep sight lines open between range finders and the end of the Nehalem Bay jetty.[27] As the court explained in *Real Estate Co.*, however, the right to use property differs from the actual use of that property; only the latter counts in determining whether there has been actual use that will support an adverse possession claim. 28 Or at 497. The record shows that, if port employees ever entered onto plaintiff's property pursuant to the agreement, they did so only occasionally. Even assuming that the port employees' entry onto plaintiff's property is attributable to defendant, their occasional use does not constitute the sort of continuous use that will establish adverse possession.

Whether viewed individually or collectively, defendant's recreational use of the plaintiff's property and the third parties' use of that property are not "significant enough" to establish, by clear and convincing evidence, actual, continuous, and exclusive use of the property for a single 10-year period. *Cf. Hoffman*, 329 Or at 564 (employing that standard). The uses are either non-exclusive (defendant's recreational use), or they are not continuous (the port's use and perhaps defendant's recreational use). Some of the uses on which defendant relies (the easements) are not attributable to him, and his payment of taxes constitutes a claim of ownership but not actual use of the property.

Beyond that, those uses do not all occur within the same 10-year period. On the one hand, defendant's recreational use, to the extent it occurred after 1989, occurred more frequently initially and diminished as time passed. On the other hand, defendant did not agree to permit the port to enter plaintiff's property until 1998, and it is unclear when or how frequently after that date port employees actually entered the property. Taking the trial court's findings of historical fact as true, we conclude that defendant's use of plaintiff's property does not establish, by clear and convincing evidence, actual, continuous, and exclusive use of that property for a 10-year period.

---

[27] The range finders allow boats coming in from the ocean to line up at the channel and enter the Nehalem River.

We summarize our conclusions briefly. We agree with the trial court that plaintiff's predecessors in interest (and plaintiff through them) acquired title to the accreted property. We disagree with the trial court that defendant acquired title to that property by adverse possession. Because the trial court erred in entering judgment in defendant's favor based on adverse possession and because the Court of Appeals erred in affirming that judgment based on accretion, we reverse the trial court's judgment and Court of Appeals decision. We remand this case to the trial court for entry of a judgment consistent with this decision.

The decision of the Court of Appeals and the judgment of the circuit court are reversed. The case is remanded to the circuit court for further proceedings.