Argued March 7; reversed November 25, 1930.

# WENIGER *v.* RIPLEY ET AL.

(293 P. 425)

*Arthur K. McMahan* of Albany (Tussing & Tussing of Brownsville and Hill, Marks & McMahan of Albany on the briefs) for appellants.

*L. G. Lewelling* of Albany for respondent.

ROSSMAN, J. The undisputed facts as disclosed by the evidence revealed the following situation: May 8, 1907, and for some years prior thereto one Sarah A.

Wright owned a tract of land in Linn county comprising 88.35 acres, of which the ten acres in controversy was a part. The Calapooia river flows across a portion of this land in a direction which may be roughly described as northwesterly. May 8, 1907, Mrs. Wright conveyed thirty acres "more or less" of this tract to one Johnson Lee by a deed which was promptly recorded in the deed records of Linn county. This deed described the property conveyed in the following language:

"Beginning on the north line of section 16, in township 14, south of range one (1) west of the Willamette meridian, in Linn county, Oregon, at a point 10.00 chains west of the northeast corner of said section, and running from thence south 18.75 chains more or less to the center of the main channel of the Calapooia river; thence down the middle of the main channel of said river to where the same intersects the north line of said section; thence east 27.50 chains more or less to the place of beginning, containing 30 acres more or less all in Linn county, Oregon."

By mesne conveyances the defendants have become the owners of these thirty acres. Each deed in the chain of title was properly recorded, and described the property conveyed in language substantially similar to the above. August 26, 1907, Mrs. Wright conveyed 58.35 acres "more or less" of the above tract of 88.35 acres to John A. and Gussie Moses Guion. This deed described the property in the following language:

"Commencing at the northeast corner of the southeast quarter of section 16, in township 14, south of range one (1) west of the Willamette meridian, Oregon, and running from thence north 20.00 chains; thence west 10.00 chains; thence north 1.25 chains, more or less to the center of the Calapooia river; thence in a northwesterly direction down the middle

of the main channel of said river to where the same intersects the north line of said section 16; * * * all lying and being in Linn county, State of Oregon.''

By mesne conveyances these 58.35 acres ''more or less'' came into the ownership of the plaintiffs; all intervening deeds were recorded and described the property in language similar to the above.

These two deeds disposed of the entire tract of 88.35 acres owned by Mrs. Wright; the portion conveyed to Lee was north of the Calapooia, while that conveyed to the Guions was south of that stream. It will be observed that in describing the line which separated the tracts the two deeds used substantially the same words; the slight variation is inconsequential. The line was described as ''the middle of the main channel of said river.'' The Calapooia river is a well-known stream in this state which has its source in the Cascade mountains and flows in a northwesterly direction until its confluence with the Willamette river at Albany in Linn county. It is approximately 100 feet wide in the places with which we are concerned.

Since the boundaries of both conveyances are described by courses and measurements upon two sides, while the other sides are bounded by the above river, the descriptions employed in the two deeds would be free from all ambiguities were it not for the fact which we shall now mention. Where the Calapooia river crosses the property previously owned by the Wrights it has employed in the past, two channels, one of which we shall designate as the north channel and the other as the south channel. Between these two is the body of land in dispute which contains possibly ten acres. The question for decision, therefore, is whether the words ''the main channel'' employed in both deeds

should be interpreted to mean the north channel or the south one. The plaintiff contends that the lower channel is the one to which the Wright deeds referred as "the main channel," while the defendants insist that ever since 1902 (the Wright deeds were executed in 1907) the south channel has been the main channel of the Calapooia river. The situation aforementioned discloses a latent ambiguity: 8 R. C. L., Deeds, p. 1041, § 96. And as suggested by the plaintiff the existence of this ambiguity warranted the reception of parol evidence as to all extrinsic circumstances which tended to show definitely which of the two channels the deeds intended to adopt as the boundary line; in fact, when a latent ambiguity appears the court will endeavor to place itself, as nearly as possible, in the position of the parties at the time when the instrument was executed by acquainting itself with all the circumstances which surrounded them, their situation, and the condition of the property. In addition it will receive all evidence naturally suggested by the description employed and evidence of other matters which may have acted upon the parties' minds: *Los Angeles Co. v. Hannon,* 159 Cal. 37 (112 P. 878, Ann. Cas. 1912B, 1065); and *Ramage v. South Penn. Oil Co.,* 94 W. Va. 81 (118 S. E. 162, 31 A. L. R. 1509). This rule of construction is predicated upon the fact that when a purchaser finds in the chain of title an ambiguity, as for instance a description which when applied to the property is applicable to more than one line, he is compelled to ascertain the intention of the parties expressed in the previous deed. See *Hudson v. McGuire,* 188 Ky. 712 (223 S. W. 1101, 17 A. L. R. 148). This being the rule of construction which is applicable to our present controversy we shall now review the evidence which discloses the circumstances surrounding Lee,

Mrs. Wright and the Guions when the two deeds were executed, as well as all other evidence suggested by the descriptions employed in the deeds.

If the aforementioned ten-acre tract lying between the two channels is adjudged to have been included within the Guion deed that conveyance will then have brought to the grantees about fifty-eight acres of land which is the approximate amount mentioned in the Guion deed; if we should determine that the disputed area was included in the Lee deed, then Lee received approximately ten acres more than the quantity mentioned in his deed and the Guions received about forty-eight acres only. It should be mentioned, however, that while a reputable surveyor testified that ten acres is included in the disputed strip a change in the course of the river since 1907 has somewhat enlarged the area of the disputed tract and that the surveyor was unable to testify that he had located the precise course of the north channel as it existed in 1907. We also add that when the Lee and the Guion deeds were executed the premises were not surveyed and the quantities mentioned in these conveyances were determined by rough estimates only.

Continuing our consideration of the evidence we notice that in 1902-03 and for some years prior thereto a quantity of logs and other drift material had become so lodged in the south channel that it effectively prevented the flow of water beyond the jam. While this blockade was in position it is clear that the principal flow of water in the river employed the north channel. A witness testified that possibly as much as fifty years ago the north channel was the one which carried the main flow of water, but since he was not questioned concerning the log jam it is impossible to determine from his testimony whether that obstruction was the

cause of the flow of water in the north channel at those early times. Apart from his testimony the conclusion would seem warranted that the log jam was a temporary one, and that but for it the main flow of water would have employed the south channel. This witness was somewhat discredited by the fact that another assertion made by him concerning a material fact was contradicted by almost every other witness who testified. In 1902-03, logging operations were instituted above this property for the purpose of supplying a sawmill below the Wright tract with logs. Since these operations depended upon the river as the means of conveying the timber from the camp to the mill the proprietors of this venture cleared the river between those two places of all obstructions, including the aforementioned log jam, so as to assure free passage for the logs. The men who performed this work, as well as the employers themselves, testified that after the jam was removed the flow of water at all normal stages passed down the south channel, and that the north channel was thereafter practically unused except during seasons of very high water. The fishermen who visited these localities after the removal of the log jam followed the south and not the north channel. One, possibly two witnesses testified that even after the log jam had been removed the north channel carried the principal flow of water. Their testimony was in opposition to that of the numerous loggers, millmen, farmers and others who were thoroughly familiar with the locality and who seemed to be creditable witnesses. After a careful study of the evidence we are of the opinion that the preponderance of it clearly shows that since 1902-03 the south channel at all normal stages of the river was the only one of the two which contained an appreciable flow of water. Since that

time the north channel has been practically unused except at seasons of very high water when the surplus water overflows not only into the north channel but also over the adjacent lands. In the dry seasons occasional quantities of water in the form of ponds may be found in the north channel but at those times this channel possesses none of the characteristics of a stream's channel. In fact, since 1902-03 the forces of nature have so obliterated the physical features of the old channel that a surveyor in the employ of the plaintiff, who visited the ground in question with one of the plaintiff's witnesses for the purpose of preparing a plat, experienced difficulty in locating the courses of the old channel; as a witness he frankly conceded that he was uncertain as to the precise boundaries of that channel. Three title abstracts, which were employed by the parties preliminary to the making of their purchases, and which contained a plat of the premises showing the course of the river, lend weight to the contention of the defendants that the course of the stream in 1907 was as described by them. There was no evidence whatever that in the locality where this land is located the word "main" had come to possess a meaning different from its common one. While an occasional witness testified that he had known the north channel as the main one there was practically no evidence that common reputation had attached to that passage the title of "main channel." These circumstances persuade us that the determination of which of the two channels should be regarded as having been the main one in 1907, is dependent upon which of the two in fact contained the main flow of water and was put to those uses which generally are served by the channel of a river. Having in mind these factors as being the controlling ones we are well satisfied that

ever since 1902-03 the south one at this point was the main channel of the Calapooia river.

 But the plaintiff seems to believe that the court when it construes the deeds should, in addition to placing itself as nearly as possible in the position of the parties, give effect to any oral agreements which Mrs. Wright and Johnson Lee may have effected concerning the meaning of the terms employed in their deed. In other words, he proposes to supplement that deed by tacking onto it an oral agreement which he contends the common grantor and Lee effected. He relies upon the following evidence: When Mrs. Wright made her conveyance to Johnson Lee she acted through the agency of her brother one David King who was familiar with this land. He testified that he regarded the north channel as the main one and that when he showed this property to Lee he pointed out to the latter only the north channel, and that they did not walk as far as the south channel. This witness, in describing what Lee said and did when the two reached the north bank, testified thus:

"The north channel, the old channel, and he says 'well, there's all the land here I will ever want.' Just that a-way, and that is about all there was said, and we turned and walked back to the road. * * * Q. I noticed the deed says 'main channel'; what channel does it refer to? A. To this channel, because we never looked anywhere else. We didn't go anywhere else, we stopped at the barn, and I says 'here is the bed of the river right here'—there was a foot bridge there, maybe the water was three feet deep, the water was still running at that time of year and that is about all there was to it."

King testified that when they computed the amount of acreage in the area purchased the lines were measured to the north and not to the south channel. We

have previously mentioned the fact that when this transaction took place no surveyor was employed and the acreage was computed by rough estimate only. The testimony of Lee was taken by deposition prior to the time when King gave the above account of the transaction. His answers, made to interrogatories which are too general to be entirely satisfactory, present a version of the above incidents which we believe indicates that he regarded the south channel as the main one. King's brother, who was also intimately familiar with this land, was one of the numerous witnesses who testified that in 1907 the south channel was the main one, and thus in part contradicted David's testimony. The plaintiff offered practically no evidence that subsequent purchasers of the two tracts were acquainted with this alleged mutual understanding that the words "the main channel" meant the "north channel." While David King testified that Lee never claimed to own anything south of the north channel there is much evidence in conflict with this statement. In fact, many witnesses testified, without substantial contradiction, that all of the predecessors in interest of the defendants asserted ownership of the contested ten-acre tract; these witnesses added that the previous owners and tenants of the ten-acre tract cut timber upon it, pastured livestock there, built fences upon it so as to connect it with the land north of the south channel, granted authority to others to take gravel from it, persuaded a group of trespassers who were cutting timber upon it to desist, and on many occasions drove the livestock, belonging to a predecessor in interest of the plaintiff, off of this tract. Respondent's brief in recognition of the cogency of this proof states: "Respondent admits that appellant Edward C. Ripley, had no suit been brought, would likely have acquired title to the dis-

puted land by adverse possession, as the testimony
of neighbors in the record show and as his own testi-
mony shows." This evidence certainly showed prac-
tical construction by user, and since it included unequiv-
ocal conduct of Lee it is persuasive that "the main
channel" meant the south channel: Devlin on Real
Est., (3d Ed.), § 840, and *Ramage v. South Penn. Oil
Co.,* supra. The only substantial effort that the plain-
tiff made to prove that he or any of his predecessors
in interest knew that David King and Lee had agreed
that the north and not the south channel should be
deemed the boundary line of the thirty acres "more
or less" purchased by Lee was the following: When
the plaintiff came into ownership an individual by
the name of O. P. Smith, who was a contract pur-
chaser from one of the plaintiff's predecessors in inter-
est told him that his boundary line included the ten
acres in dispute. The plaintiff obtained title through
the default of a mortgage, owned by him upon the
Guion tract. He had acquired this mortgage, from its
previous owner in a trade without visiting the land or
making any inquiries concerning it. We are satisfied
that if Lee and King agreed that the north channel
should be construed as the main channel no subsequent
purchaser of either of the tracts was aware of that
fact. But even assuming that David King's version of
the above matter is the true one the circumstances
related by him are not controlling. The best that can
be said for his account of that transaction is that he
and Lee agreed that there should be assigned to the
words "the main channel" the meaning "the north
channel." In other words, that they attempted to
deprive the words "the main channel" of their com-
mon signification and assigned to them a meaning
mutual to themselves. We have previously stated that

in construing a deed the court endeavors to ascertain the intention of the parties but the intention sought is the one expressed in the deed and not some secret unexpressed intention which the parties refrained from incorporating within the instrument of conveyance. As was well stated by the Kentucky court in *Hudson v. McGuire,* supra: "It would be destructive of the security of deeds if the rights of purchasers for value should be made to depend on the intention in the mnid of remote vendors that was not expressed in the conveyance, and of which intention they had no actual notice." From *Hennigan v. Matthews,* 79 Or. 622 (155 P. 169), we quote: "It would create great confusion in titles if some subsequent innocent purchaser for value could be deprived of a considerable portion of his domain by parol proof of an intent existing in the minds of his predecessors in title, of which he had no knowledge." It must be evident that the intention which the courts seek to find is the intention which the parties expressed in the deed and not some secret, unexpressed intention. See Devlin on Real Est., (3d Ed.), § 840; *Bartholemew v. Muzzy,* 61 Conn. 387 (23 Atl. 604, 29 Am. St. Rep. 206); *Atkins v. Bordman,* 2 Metcalf, (Mass.) 457 (37 Am. Dec. 100); *Gaddes v. Pawtucket Institution,* 33 R. I. 177 (80 Atl. 415; Ann. Cas. 1913B, 407); *Clayton v. Gilmer County Court,* 58 W. Va. 253 (52 S. E. 103, 2 L. R. A. (N. S.) 598); and *Los Angeles Co. v. Hannon,* supra; *Antley v. Antley,* 132 S. Car. 306 (128 S. E. 31). It follows from the foregoing that in determining which of the two channels in 1907 was the main one we can not take into consideration the understanding which the plaintiff contends was effected by Lee and Mrs. Wright. We have reviewed not only the principles of law applicable to this issue but also the evidence because no objection

was made to the latter when the plaintiff offered it. But we believe that the aforementioned rules of construction are principles of substantive law, and are controlling; we have, therefore, given them full effect in arriving at our conclusions.

After a careful review of the evidence, and controlled by the above rules of construction we are of the opinion that in 1907 and for many years prior thereto the main channel of the Calapooia river was the south channel.

 We do not believe that the mere fact that the two sets of deeds mention quantities should cause those recitals to persuade us that the north channel was the main one in 1907. We have previously mentioned the fact that if the south channel is held to be the boundary line the Guion and the Lee deeds brought their grantees amounts of acreage somewhat at variance with the recitals of those instruments. It is worthy of observation, however, that those deeds, as well as all others in the chains of title accompanied quantity with the qualifying words "more or less," which mean "approximately," as distinguished from definite, precise amounts. When a deed indicates an intention that quantity shall prevail over courses and measurements that intention will be given effect; but generally the recital of quantity is subordinated to boundaries, measurements, courses, etc.: Or. L. (1920), § 878, subd. 2; Devlin on Real Estate, (3d Ed.), § 1029, and 18 C. J., p. 287. What slight evidence is available indicates that Lee's purchase price was not determined upon an acreage basis; the record is silent upon the price which the Guions paid, and the manner in which it was determined. Apparently the Guion and Lee tracts, as well as the ten-acre tract, have been employed largely

for pasturage purposes, and the various purchasers estimated the suitability of the tracts to supply their needs by vision, condition of the land, physical characteristics, etc., rather than precise measurement of quantities. It is our opinion that the discrepancy in amounts ought not persuade us to move "the main channel" to the disused north channel.

· ▬ Having reached the foregoing conclusions we invoke the presumption that Mrs. Wright intended to convey and Lee intended to take the premises as they openly appeared at the time when the deed of May 8, 1907, was executed: *North Powder Co. v. Coughanour,* 34 Or. 10 (54 P. 223).

It follows that the decree of the circuit court must be reversed and the cause will be remanded to that tribunal with instructions to enter a decree in favor of the defendants not out of harmony with the foregoing conclusions. Costs and disbursements will be allowed to neither party.

COSHOW, C. J., and RAND, J., concur.

KELLY, J., did not participate.