No. 54          January 31, 2024          449

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
by and through its
Oregon Department of Transportation,
*Plaintiff-Respondent,*

*v.*

Howard N. DIETRICH, JR.
et al.,
*Defendants,*
*and*

THUNDERBIRD HOTEL, LLC,
*Defendant-Appellant.*

Multnomah County Circuit Court
19CV48411; A178088

Steffan Alexander, Judge.

Argued and submitted May 12, 2023.

Michael J. Kavanaugh argued the cause and filed the briefs for appellant.

Inge D. Wells, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Shorr, Presiding Judge, Mooney, Judge, and Pagán, Judge.

MOONEY, J.

Affirmed.

## MOONEY, J.

Defendant Thunderbird Hotel, LLC (Thunderbird),[1] appeals a judgment quieting title in the State of Oregon to a strip of land that lies beneath and immediately west of the Interstate-5 (I-5) bridge along the south bank of the Columbia River at the north end of Hayden Island. Thunderbird contends that the state conveyed that strip of land to Hayden Island, Incorporated, in 1975 and that Thunderbird later acquired that strip from subsequent purchasers. The state disagrees, contending that it retains ownership of the disputed strip of land, which is part of the I-5 Right of Way.

Thunderbird raises seven assignments of error on appeal. Assignments one and two challenge the trial court's construction of a 1960 judgment for the state in an eminent domain action. Assignment three contends that the trial court erred in sustaining the state's objection to a question asked by Thunderbird's attorney when cross-examining the state's expert about the ownership of previously submerged land after it was artificially filled. Assignments four, five, and six do not adhere to the requirements of ORAP 5.45(3) because they do not precisely challenge "rulings" of the trial court. We nevertheless understand those assignments to challenge the trial court's construction of the 1975 deed of conveyance from the state to Hayden Island, Incorporated, and a 2004 deed to Thunderbird. In its seventh assignment, Thunderbird contends that the trial court erred when it rejected its statute of frauds defense.

We conclude that the trial court did not err in ruling that the state's title to the disputed strip of land is superior to that of Thunderbird. We therefore affirm.

## I.  STANDARD OF REVIEW

To prevail in a quiet title action, a plaintiff must prove that it has a substantial interest in, or claim to, the disputed property and that its title is superior to that of the defendants. *Coussens v. Stevens*, 200 Or App 165, 171, 113 P3d 952 (2005), *rev den*, 340 Or 18 (2006). "While that standard does not require the plaintiff's title to be above reproach, it

---

[1] Except for Thunderbird, appellant herein, all named defendants were dismissed below.

does require that plaintiffs prevail on the strength of their own title as opposed to the weaknesses of defendants' title." *Id.* (internal quotation marks and citation omitted). Because the state relied upon the language of the various deeds of conveyance to establish the superiority of its title to that of Thunderbird, we review the trial court's legal conclusions about the intent of the parties to those conveyances for legal error. *Howe v. Greenleaf*, 260 Or App 692, 700, 320 P3d 641 (2014). To the extent that the trial court made factual findings in support of its legal conclusions, we accept those underlying factual findings so long as they are supported by any evidence in the record. *Sea River Properties, LLC v. Parks*, 355 Or 831, 834, 333 P3d 295 (2014).[2] The facts are drawn from the record consistent with that standard.

## II.    HISTORICAL AND PROCEDURAL FACTS

### A.  *Historical Facts*

Hayden Island is an island situated in the Columbia River, surrounded on all sides by river water, and located completely within the borders of the state of Oregon.[3]



The Columbia River is a navigable stream that was in existence in 1859 when Oregon became a state. It is undisputed that the state has owned the beds and banks of the Columbia along Hayden Island since that time.

---

[2] Neither party requested *de novo* review, and we decline to exercise our discretion to conduct such a review. ORS 19.415(3)(b).

[3] The drawings in this opinion are intended only to facilitate the reader's understanding of the relative position of the river, property, and conveyances in question. They are not drawn to scale, and they are not accurate in terms of precise measurements, geographic contours, or otherwise. Finally, the drawings do not depict all elements included in the relevant survey records.

In the early 1900s, the State of Oregon began acquiring land on Hayden Island to construct the I-5 bridge and form the I-5 Right of Way.[4] Acquisitions in 1915, 1938, and 1946 resulted in state ownership of land extending generally southward, or upland, from the bank of the Columbia on the north side of Hayden Island.



The state's final acquisition occurred in 1960 through an eminent domain proceeding that expanded the I-5 Right of Way to its current width of 203 feet and established its current western boundary. The 1960 judgment, as pertinent here, described one of the parcels acquired by the state through eminent domain as:

> "[A] strip of land 83 feet in width *extending from the meander line* on the North Bank of Hayden Island to the Northerly line of that tract conveyed [in 1946] to the State of Oregon, * * * said strip of land being Westerly of and *adjacent to the Westerly right of way line* of the Pacific Highway, as said Westerly right of way line is described in Parcel No. 1 of that [1938] deed to the State of Oregon * * *."

(Emphasis added.) The meander line refers to a survey line that marked the bank of the Columbia River, and which originated in an 1860 survey conducted by the General Land Office and also appeared in a county survey from 1947.

---

[4] The "I-5 Right of Way" refers to the land over which the I-5 bridge was constructed. The parties' briefing refers to this area generally as the "right of way" and this opinion refers to this area more specifically as the I-5 Right of Way. We emphasize that the undisputed property that forms the I-5 Right of Way is owned in fee simple by the State of Oregon.



The bank of the Columbia River on the north side of Hayden Island located under and adjacent to the I-5 Right of Way was artificially filled between 1966 and 1974. The filled area was no longer submerged or submersible, and the bank of the Columbia moved north from the old meander line to the newly created bank. The parties agree that the fill did not affect then-existing property rights. Ownership of the property that was no longer submerged or submersible thus remained in the State of Oregon.

In 1975, after the fill was completed, the state conveyed a parcel of land to Hayden Island, Incorporated, one of Thunderbird's predecessors in interest. In relevant part, the deed describes the property being conveyed as:

> "Beginning at the intersection of the ordinary high water line on the South Bank of the Columbia River with the Westerly right of way line of the Interstate Highway No. 5 *** thence in a straight line through an interchange to a point on the right of way at the North End of the Interchange N 22° 41' 43" E, 1013.06 feet; *thence N 22° 46' 30" E, 560.0 feet along the Westerly right of way line of Interstate 5* to the point of beginning."

(Emphasis added.) The parties agree that the bearing and distance call does not connect in a straight line to the "Westerly right of way line of Interstate 5" established in the 1960 judgment. It is the location of that line—where the western side of the state's I-5 Right of Way meets the eastern side of the parcel conveyed to Hayden Island, Incorporated,

in 1975—that is at the center of the parties' dispute in the underlying quiet title action.



Thunderbird came to own a portion of the parcel of land that had been conveyed to Hayden Island, Incorporated, after a series of conveyances, the most recent of which occurred in 2004. The deeds of those conveyances, including the 2004 deed, contain yet a different legal description of the eastern boundary of the parcel conveyed: "[T]hence South 63° 06' East *55.91 feet, more or less*, to the intersection with the Westerly right of way of the Interstate 5 Highway." (Emphasis added.) As with the 1975 deed, it is undisputed that the exact distance call in the 2004 deed does not align with the western boundary of the I-5 Right of Way.

B.   *Procedural Facts*

        At the bench trial, the parties focused their dispute on whether the eastern boundary of the 1975 conveyance, when properly construed, runs in a straight line north from the western boundary of the I-5 Right of Way established in 1960 to the post-fill bank of the Columbia River. In the opinion of the state's expert, Michael Fallert, a surveyor with the Oregon Department of Transportation (ODOT), a grant to a meander line is a presumptive grant to the water itself. He reasoned that because the western boundary of the I-5 Right of Way established by the 1960 judgment extended to "the meander line," it was an extension to the river itself.

Relying on ORS 93.310(2),[5] Fallert testified that because the I-5 Right of Way is an ascertained boundary, it prevails over the conflicting course and distance description in the 1975 deed, meaning that the eastern boundary of the parcel conveyed to Hayden Island, Incorporated, is, essentially, the western boundary of the state's I-5 Right of Way, and thus extends in a straight line north to the river at its post-fill location. According to Fallert, the state did not convey the disputed strip of land to Thunderbird's predecessor, and it continues to own the disputed area in fee simple.

Thunderbird also called a surveyor, Travis Jansen, to testify as an expert. Jansen offered his opinion that because the artificial fill caused the riverbank to move, it converted the meander line from a reference point to the fixed northern boundary of the parcel acquired by the state in 1960. The western boundary of the I-5 Right of Way established by the 1960 judgment would, thus, stop at the 1960 meander line rather than continue to the post-fill bank of the Columbia River. At the point where the I-5 Right of Way intersects with the meander line, Jansen would rely upon ORS 93.310(1) and follow the course and distance description in the 1975 deed to determine the western boundary of the disputed area. Construing the 1975 deed in that way results in an approximately seventeen-foot "jog" beyond the I-5 Right of Way. Thunderbird thus argued that that "jog" established the eastern boundary of the parcel of land conveyed to Hayden Island, Incorporated, in 1975.

As to the 2004 deed, Fallert testified for the state that the distance call of 55.91 feet (1) did not appear in any of the state's deeds or judgments, and (2) if followed literally, would place the western boundary approximately

---

[5] ORS 93.310 provides, as relevant:

"The following are the rules for construing the descriptive part of a conveyance of real property, when the construction is doubtful, and there are no other sufficient circumstances to determine it:

"(1) Where there are certain definite and ascertained particulars in the description, the addition of others, which are indefinite, unknown or false, does not frustrate the conveyance, but it is to be construed by such particulars, if they constitute a sufficient description to ascertain its application.

"(2) When permanent and visible or ascertained boundaries or monuments are inconsistent with the measurement, either of lines, angles or surfaces, the boundaries or monuments are paramount."

28.5 feet east of the I-5 Right of Way. However, the qualification "more or less" indicates that the distance call is not intended to be exact. As with his interpretation of the 1975 deed, Fallert opined that the 2004 deed language bounds the property conveyed on the east with the western edge of the I-5 Right of Way and that the ascertained boundary prevails over the distance call. Each parties' respective construction of the relevant judgment and conveyances is shown below.

**Thunderbird's Construction:**



**The State's Construction:**



The trial court found that Jansen's interpretation of the 1960 judgment "would result in strips of land between the meander line and the ordinary high-water line" and concluded "as a matter of law[,] that the State's expert is correct that the [1960] judgment [included] property to the water itself." The trial court then concluded that, "As a result, the Western right of way boundary also extends to the water itself." In construing the 1975 deed, the trial

court similarly rejected Jansen's interpretation, concluding, "Based on the text of the 1975 [] Deed, with the context of the 1960 Final Judgment, and ORS 93.310(2), the court finds that the State's expert provided the correct interpretation of the legal description ＊＊＊." Similarly, the court agreed with Fallert with respect to the 2004 deed:

> "The court finds that construction of the ＊＊＊ 2004 Deed is not doubtful because the distance call of 55.91 feet is 'more or less' and thus is an approximation.
>
> "＊＊＊＊＊
>
> "In the alternative, the court finds that even if the construction ＊＊＊ was doubtful, the Westerly right of way of Interstate 5 is an ascertained boundary. Thus, the Westerly right of way boundary is paramount over the distance call of 55.91 feet."

Finally, the trial court rejected Thunderbird's statute of frauds defense finding that:

> "[T]he State of Oregon's title has existed since statehood and there is no need for a deed to establish that title. ＊＊＊ Moreover, the 1960 Judgment is a writing that transfers the Disputed Area to the State of Oregon."

The trial court concluded that the state had established the superiority of its title over that of Thunderbird, as a matter of fact and law, and it quieted title to the property, including the disputed area, in the state. This appeal followed.

### III.   ANALYSIS

A.  *Introductory Principles*

We begin with some introductory legal principles that guide our analysis. First, "[t]he responsibility of the court in construing a deed is to ascertain and give effect to the intentions of the parties as found in the language of the instrument and the circumstances attending its execution." *Tab Enterprises v. Heare*, 37 Or App 879, 884-85, 588 P2d 671 (1978). When the construction of a deed is doubtful, and there are no other sufficient circumstances to determine it, ORS 93.310 provides rules of construction. ORS 93.310(1) provides that "definite and ascertained particulars" control over "indefinite, unknown or false" information in a conveyance

instrument. ORS 93.310(2) provides that "permanent and visible or ascertained boundaries or monuments" prevail over conflicting "measurement[s], either of lines, angles or surfaces." While "ascertained boundaries and monuments" are not statutorily defined, Black's Law Dictionary defines "ascertainability" as something susceptible to a "definite and assured determination," and "monument" as "[a]ny natural or artificial object that is fixed permanently in land and referred to in a legal description of the land." *Black's Law Dictionary* 140, 1207 (11th ed 2019). In short, when the location of a property boundary is ambiguous, we first attempt to discern the intent of the grantor. If the intent is unclear, a course and distance description will control over an indefinite or incorrect description, but references to definite and permanent boundaries and monuments in a conveyance will prevail over an inconsistent course and distance description.[6]

     Second, when the boundary of land that borders navigable waters is in dispute, there are additional considerations involving state sovereignty and public resources. The United States Constitution reserved title to the shores of navigable waters for the states. *Pollard v. Hagan*, 44 US 212, 216, 11 L Ed 565 (1845). Each state has therefore held title to the shores between the high and low water marks of navigable waters within its boundaries since statehood. *See Johnson v. Knott*, 13 Or 308, 310, 10 P 418 (1886). In this sense, "[a] right to the shore between high and low water-mark is a sovereign right, not a proprietary one." *Pollard*, 44 US at 215-16. "[P]roprietors of land bounded on a navigable river own the soil to [the] high-water mark, and no further." *Andrus v. Knott*, 12 Or 501, 502 n 1, 8 P 763 (1885). The "line of ordinary high water" is "the line on the bank or shore to which the high water ordinarily rises annually in season." ORS 274.005(3); *see also Johnson*, 13 Or at 310.

     It follows that Oregon has owned the beds and banks of the Columbia River located within and bordering

---

[6] Thunderbird does not appear to dispute that the I-5 Right of Way is an ascertained boundary or monument, but rather, contends that the reference to the I-5 Right of Way in the 1975 deed is erroneous because the I-5 Right of Way does not extend past the meander line referred to in the 1960 deed. In Thunderbird's view, the reference to the I-5 Right of Way is "false" under ORS 93.310(1), and so the course and distance description prevails.

the state, for the benefit of the public, from the time it entered the Union in 1859. *See Hardy v. Land Board*, 274 Or App 262, 265-66, 360 P3d 647 (2015), *rev den*, 358 Or 550 (2016), *cert den*, 580 US 958 (2016) (explaining that, under the equal footing doctrine, Oregon gained title to all submerged and submersible lands within and bordering the state that were under navigable or tidally influenced waters when it became a state in 1859); ORS 274.025(1) ("The title to the submersible and submerged lands of all navigable streams and lakes in this state now existing or which may have been in existence in 1859 when the state was admitted to the Union, or at any time since admission, and which has not become vested in any person, is vested in the State of Oregon. The State of Oregon is the owner of the submersible and submerged lands of such streams and lakes, and [it] may use and dispose of the same as provided by law.").

With this background in mind, the precise location of the water is often consequential, and surveyors use "meander lines" as a tool to survey lands bordering navigable rivers. *See Montgomery v. Shaver*, 40 Or 244, 249, 66 P 923 (1901) (explaining that a dispute over property bordering a river presents a question of fact pertaining to the precise location of the ordinary high water mark); *see also Railroad Company v. Schurmeir*, 74 US 272, 287, 19 L Ed 74 (1868) ("In preparing the official plat from field-notes, the meander-line is represented as the border-line of the streams, and shows, to a demonstration, that the water-course, and not the meander-line, as actually run on the land, is the boundary."). A meander line, like the one referenced in the 1960 judgment, is defined as follows:

> "[A] survey line demarcating the contours of a navigable body of water. Where a meander line of a water body is given as a boundary in a property description, the water itself, and not the meander line as shown on the government survey, is the true boundary of the riparian proprietor."

*Coussens*, 200 Or App at 172 n 5 (citation omitted). Thus, "a grant to the meander line is presumed to be a grant to the water." *Stott v. Stevens*, 127 Or App 440, 445, 873 P2d 380, *rev den*, 319 Or 274, *cert den*, 513 US 964 (1994). More precisely, a grant to the meander line is a grant to the ordinary

high water line. *Cawlfield v. Smyth*, 69 Or 41, 45, 138 P 227 (1914) ("[T]he ordinary high-water mark constitutes the true meander line."). This presumption is consistent with the "policy against construing conveyances so as to create strips of land, the title to which would remain in abeyance for lengthy periods." *Stott*, 127 Or App at 445 (citing *Nelson v. Vandemarr*, 281 Or 65, 70, 573 P2d 1232 (1978)).

Precisely where "the water itself" is located may, of course, move over time due to natural or artificial conditions. "Accretion is a geological process by which new land forms when sand, silt, or soil is gradually and imperceptibly deposited on the edge of existing land." *Sea River Properties, LLC*, 355 Or at 841. When accretion occurs, the property boundary moves with the water. *Id.* at 843. That rule promotes efficiency. *Id.* at 844. Generally, an upland owner has an interest in accessing water that borders their property, and so "it is more efficient to grant title to the contiguous landowner, who likely has the greatest interest in making the gradual additions useful." *Id.*

Avulsion is "'[t]he removal of a considerable quantity of soil from the land of one man, and its deposit upon or annexation to the land of another, suddenly and by the perceptible action of water.'" *State Land Board v. Sause et al*, 217 Or 52, 79, 342 P2d 803 (1959) (quoting 2 Blackstone's Commentaries, 262). While avulsion refers to a sudden natural change caused by flooding or the like, artificial changes such as those caused by dredging or filling are also treated as avulsive events for legal purposes. *Id.* at 99 (holding that "sudden artificial changes, such as dredging by the upland owner, do not work a change in his boundary"). The doctrine of avulsion aims to demarcate public and private ownership by protecting state resources while also protecting private property owners against unconstitutional takings. *Sause*, 217 Or at 102; *Land Bd. v. Corvallis Sand & Gravel*, 283 Or 147, 165, 582 P2d 1352 (1978). Specifically, "a riparian owner cannot add to his property against the state by filling in the area adjacent to his property," but "[a]s long as [a riparian owner] does not encroach on the rights of the state[,] *** he may make artificial changes in his bank which will not destroy his title or affect his boundary." *Sause*, 217 Or at 99,

102. However, an avulsive change to the course of a river does not automatically transform private property into public property. *See Corvallis Sand & Gravel*, 283 Or at 165, 167 (holding that when a sudden event, like rapid flooding, converts an overflow channel located on private property into the bed of the river itself, the new riverbed remains as private property, noting that a rule to the contrary "would raise serious questions about the taking of private property for public use without compensation"). In sum, the rules of accretion and avulsion are straightforward: "[I]f the change be gradual, the boundary of the upland will follow the water; if it be sudden, the boundary remains as before." *Sause*, 217 Or at 80.

B.  *The 1960 Eminent Domain Judgment*

We begin by reviewing the trial court's construction of the 1960 judgment, as it provides essential context in determining the boundaries of the 1975 deed. The question is whether the boundary of the parcel acquired by the state in 1960 moved with the Columbia River after the artificial fill.

As we have explained, the 1960 eminent domain judgment was a grant to the water—that is, to the ordinary high water line of the Columbia River as it existed at the time. Thunderbird argues that the avulsive fill fixed the northern boundary of the relevant parcel acquired by the state in 1960 at the then-existing ordinary high water line. Thunderbird is correct that the north boundary of the parcel acquired by the state in 1960 did not move. An avulsive change to a water line has no effect on existing boundaries or on title to the submerged or submersible land. *Corvallis Sand & Gravel*, 283 Or at 167. The 1960 judgment, therefore, extended and conveyed the parcel of land to the ordinary high water line of the Columbia River as it existed in 1960. The artificial fill was an avulsive event that effectively moved the bank of the Columbia River north, and according to the rule of avulsion, the boundary of the upland property remains as it was before the avulsive event.

The trial court was correct when it found that the 1960 judgment included property to "the water itself," but it

erred when it found that the 1960 judgment also conveyed property to the relocated position of "the water" following the fill. That error was nevertheless harmless. As a matter of law, the previously submerged and submersible land in question remained in state ownership after the artificial fill, as discussed above. The state, thus, owned the land created by the fill along with the adjacent and contiguous upland parcels that it had acquired within the I-5 Right of Way. As the trial court correctly noted, the 1960 judgment "did not leave a strip of land between the meander line and the water." But that is because references to "the meander line" and to "the water" were references to the same point—the ordinary high water mark. *See Oregon v. Portland Gen. Elec. Co.*, 52 Or 502, 533, 98 P 160 (1908) (on rehearing) ("[H]is title is not confined to the meander line, but extends to the stream, and includes all of the upland, if any, between the meander line and the line of ordinary high water."). As we will explain, the 1975 deed is what extends the western boundary of the I-5 Right of Way—and the eastern boundary of the property thus conveyed—in a straight line to the new ordinary high water line as it existed in 1975.

C.   *The 1975 Deed*

We turn next to Thunderbird's fourth, fifth, and sixth assignments of error which, as we understand it, challenge the trial court's construction of the 1975 deed. A legal description of real property is ambiguous if it is susceptible to more than one plausible interpretation. *See Esquire Investments, Inc. v. Summers*, 327 Or App 509, 517, 536 P3d 1081 (2023) ("Not only does plaintiffs' reading of the * * * deed result in textual anomalies, but an equally plausible—and perhaps more persuasive—reading is possible."); *see also Yogman v. Parrott*, 325 Or 358, 361-63, 937 P2d 1019 (1997) (finding a restrictive covenant ambiguous because the text was susceptible to multiple interpretations).

Here, the 1975 deed describes the eastern boundary of the property conveyed as extending "thence N 22° 46' 30" E, 560.0 feet along the Westerly right of way line of Interstate 5 to the point of beginning." It is not disputed that the property line described does not align with the west edge of the I-5 Right of Way. The course and distance

description, read literally, would result in a jog to the east of the I-5 Right of Way by about 17 feet. But the 1975 deed also includes a reference to "the Westerly right of way line of" I-5. On the one hand, the deed might plausibly be read as following the course and distance description on the basis that the I-5 Right of Way ends at the 1960 ordinary high-water mark. The deed might also plausibly be read as continuing the western boundary of the I-5 Right of Way to the new ordinary high water line in 1975 because the text of the 1975 deed begins at a point specifically intersecting with the west edge of the I-5 Right of Way and concludes with a line that follows "along the Westerly right of way." Given two possible interpretations, both of which are plausible, the 1975 deed is ambiguous.

We next look for the intent of the grantor, in this case the state. We begin by noting that the state's ownership of contiguous parcels is relevant.[7] At the time of the 1975 conveyance, both the disputed area and the adjacent 1960 parcel were owned by the state. The text of the 1975 deed "bounds" the western border of the state's property with the south bank of the Columbia River and the I-5 Right of Way, which strongly suggests that the state intended that the I-5 Right of Way continue in a straight line.

To the extent that the state's intent may be unclear, the statutory rules of construction provide that ascertained boundaries or monuments prevail over conflicting course and distance descriptions. ORS 93.310(1) - (2); *Bean v. Kmetic*, 282 Or 739, 745, 580 P2d 1022 (1978). The I-5 bridge is an artificial object permanently fixed in land and the I-5 Right of Way is a definite and objectively identifiable boundary that is referenced in the 1975 legal description. The reference is not "false" as Thunderbird argues—the I-5 Right of Way existed at the time of the conveyance and there is no evidence of mistake in including the reference to it in the 1975 deed. Thus, the I-5 Right of Way prevails over the conflicting course and distance call. Although the trial court erred in finding that

---

[7] Although not directly applicable to this case, common ownership and common use of contiguous parcels of land may establish "unity" of separate parcels, which is relevant in certain contexts, such as when calculating just compensation in eminent domain actions. *See City of Salem v. H.S.B.*, 302 Or 648, 653, 733 P2d 890 (1987).

the 1960 judgment itself transferred title to the state of the disputed area, the court also based its decision on the text of the 1975 deed and, in doing so, correctly concluded that the state established an unbroken chain of ownership.

D.  *Remaining Assignments of Error*

We reject as inconsequential Thunderbird's arguments concerning the trial court's findings about the legal description of the boundary described in the 2004 deed. That deed describes the western boundary as "55.91 feet, more or less, to the intersection with the Westerly right of way of the Interstate 5 Highway." As Thunderbird acknowledges, its own expert, Jansen, did not testify to the proper interpretation of the 2004 deed. The state's expert, Fallert, did testify on that subject, and he explained that following the exact call of "55.91 feet," which appears in no state records, would cause the east boundary of Thunderbird's parcel to protrude approximately 28.5 feet beyond the I-5 Right of Way, which would extend Thunderbird's property farther beyond the I-5 Right of Way than even the 1975 deed, if it were construed in Thunderbird's favor.

Fallert also testified that the phrase "more or less" signifies an approximate measure. That is consistent with our caselaw recognizing that a conveyance that includes "more or less" in a distance call does not create ambiguity in an otherwise clear property line, but rather "indicates that the measurement may be approximate or inaccurate." *Kraft v. Estate of John Ronald Cooper, Sr.*, 263 Or App 420, 425, 330 P3d 639 (2014); *see also Weniger v. Ripley*, 134 Or 265, 277, 293 P 425 (1930) ("[T]he qualifying words 'more or less,' *** mean 'approximately,' as distinguished from definite, precise, amounts."). Moreover, the 2004 distance call, if construed precisely as called, would convey more property than Thunderbird's predecessor purportedly owned, and a grantor cannot convey more than they own. The trial court did not err, on that record, in finding that the boundary established in the 2004 deed aligned with the I-5 Right of Way.

Thunderbird's remaining assignments of error rest on the flawed premise that state agencies, rather than the

State of Oregon, own the disputed property. Specifically, Thunderbird argues that the trial court erred in (1) sustaining the state's objection to a question posed to the state's witness on cross-examination concerning ODOT's ownership of the filled land,[8] and (2) rejecting its statute of frauds defense.

These arguments are without merit. Owning property "by and through" the Department of State Lands (DSL) or ODOT, for example, simply means that the agency, as grantor or grantee, acted in its capacity as agent for and on behalf of its principal, the State of Oregon. Under ORS 270.020, "[t]itle to any parcel of land held by a state agency shall be in the name of the state, by and through the state agency controlling the parcel." Further, ORS chapter 270, which governs state real property, repeatedly emphasizes that state agencies act "for the state." *See*, *e.g.*, ORS 270.015(1) - (2) (providing that the powers granted in various provisions of ORS chapter 270 are "vested in the State of Oregon" and that "the state shall act by and through its duly constituted board, commission or agency"); ORS 270.100(1)(a) (providing that "the state agency acting for the state in the sales transaction" must report the agency's intent to sell real property in its control to the Oregon Department of Administrative Services prior to the sale); ORS 270.100(3) ("Before any terminal disposition of real property[,] *** *the state agency acting for the state* in the transaction must secure approval of the transaction from the Oregon Department of Administrative Services.") (Emphasis added); ORS 270.130 (providing that the "state agency acting for the state" shall comply with certain notice and publication requirements prior to a sale of real property).

Thunderbird contends that because ORS 274.915(2)[9] authorizes DSL to sell submerged or submersible lands,

---

[8] Thunderbird's counsel asked Fallert to clarify the statement in his opinion letter that the meander line extended to the Columbia River after the artificial fill. Fallert agreed with counsel that the new land was state property, but counsel asked: "So—but that's contrary to the admissions in this case that that filled land belonged to [the Department of State Land] and not ODOT, correct?" The state objected on the basis that the question misstates the law: "You know, the State of Oregon is not splintered in its ownership. It acts by and through its agencies, but the property is all in the State of Oregon." The court sustained the objection.

[9] ORS 274.915(2) provides, "[T]he [D]epartment [of State Lands] may sell, lease or trade new lands created upon submersible or submerged lands owned by the state ***."

ODOT does not have a viable claim to the land absent a deed conveying title to the agency. But the state's ownership is not fractured. ORS 274.005(8) provides that submersible land is owned by the state "by virtue of her sovereignty." ORS chapter 274 delegates authority to DSL to manage submerged and submersible land; however, the state retains title and the right to convey or use those lands belongs to the state *through* DSL. *See* ORS 274.025(1) ("The State of Oregon is the owner of the submersible and submerged lands of such streams and lakes, and may use and dispose of the same as provided by law."). The trial court properly concluded that the state's ownership of the disputed area has existed since statehood and therefore, there is no need for a physical deed to establish title to that land. Thunderbird's statute of frauds defense necessarily fails. Finally, Thunderbird does not explain why the trial court's decision to sustain the state's objection was harmful because as a matter of law, the state's ownership is not fractured.

## IV.   CONCLUSION

The state did not acquire title to the land created by the artificial fill by virtue of the 1960 eminent domain judgment, and the trial court erred in concluding otherwise. However, the state already owned the submerged and submersible land that was later filled, and because the fill did not affect its ownership rights in that land, the trial court's error was harmless. The 1975 deed contains an ambiguity regarding the eastern boundary of the land conveyed by that deed, but the text of the deed strongly suggests that the state intended to continue the I-5 Right of Way north in a straight line, and in any case, under ORS 93.310(2), the reference to the I-5 Right of Way controls over the conflicting course and distance call. The distance call in the 2004 deed is inexact and, therefore, of no consequence to our analysis. Finally, we reject Thunderbird's remaining assignments of error because the state agencies hold land in the name of the state. The state established that it has a substantial claim to the disputed property and that its title is superior title to that of defendant's. On this record, the trial court did not err in quieting title to the state.

Affirmed.